Elise A. Hoban, Emilie A. Piquette Sands, the Sisters of Charity of the City of Detroit, the House of Providence and The Home for the Aged of the Little Sisters of the Poor, proponents v. Thomas S. Campau and Fanny E. Piquette, guardian of Marie E. M. Piquette and Charles J. Piquette, contestants.

*Wills—Testamentary capacity—Acknowledgments.*

1. Average mental capacity is not required for the making of a will; power to buy and sell, to deal in property on the basis of contract, to give deeds and leases and make gifts by delivery, implies sufficient capacity to devise property.

2. The facts that one is an invalid, nervous, reserved and disinclined or even hardly able to read and write, do not of themselves prove anything against one's testamentary capacity.

3. Proof of such imbecility of mind as disqualifies one from making a will should be shown; if it does not amount to idiocy, by the testimony of witnesses who have had personal knowledge of the facts within twenty years before the will was executed.

4. A notary public or justice of the peace cannot properly take the acknowledgment of a person to a deed if he believes him mentally incompetent to make a will; nor may he take an acknowledgment through a third person.

5. Where the contestants of a will attack the competency of the testator but make no case entitling them to go to the jury on that point, they cannot be injured by any rulings as to the admission of rebutting evidence.

6. Whether the contestant of a will can raise the issue that the testator was unduly influenced after appealing from the probate of the will on the sole ground that he lacked testamentary capacity—Q.

Error to Wayne. (Speed, J.)  Oct. 30–31.—Dec. 21.

Appeal from probate. Contestants bring error. Affirmed.

*James Caplis, William B. Moran, John Logan Chipman, John Atkinson* and *Alfred Russell* for appellants, cited as to undue influence: *Parish v. Delafield* 25 N.Y. 35; *Chess v. Chess* 1 Penrose & Watts 41; *Waters v. Cullen* 2 Bradf. 357; *Paske v. Ollat* 2 Phill. 323; *Middleton v. Forbes* 1 Hagg. 395; *Ingram v. Hyatt* 1 Hagg. 384; *Baker v. Batt* 1 Curt. 125; 2 Moore P. C. 317; *Butlin v. Barry* 1 Curt. 614; *Durnell v. Canfield* 1 Robert. Ecc. 51; *Durling v. Loveland* 2 Curt. 225; *Croft v. Day* 1 Curt. 782; 3 Moore P. C. 136; *Mitchell v. Thomas* 10 Jur. 461; 12 Jur. 967; 6 Moore P. C. 137; *Raworth v. Marriott* 1 M. & K. 643; *Jones v. Godrich* 5 Moore P. C. 16; *Mynn v. Robinson* 2 Hagg. 169; *Crispell v. Dubois* 4 Barb. 393; *Carroll v. Carroll* 1 Milw. 445; *Murphy v. Fitzgerald* id. 403; conduct of relations towards one is the best evidence of their opinion of his mental soundness: *Jacox v. Jacox* 40 Mich. 473.

*C. J. O'Flynn, Henry D. Barnard, Don M. Dickinson* and *Ashley Pond* for appellees, cited as to undue influence: *Deas v. Wandell* 1 Hun 120; *Cudney v. Cudney* 68 N. Y. 148; *Gardiner v. Gardiner* 34 N. Y. 155; *Seguine v. Seguine* 3 Keyes 663; *McMahon v. Ryan* 20 Penn. St. 329; *McLaughlin v. McDevitt* 63 N. Y. 213; *Tyler v. Gardiner* 35 N. Y. 559; *Leeper v. Taylor* 47 Ala 221; *Tyson v. Tyson* 37 Md. 567; *Rutherford v. Morris* 77 Ill. 397; *Society v. Loveridge* 70 N. Y. 388; *Wittman v. Goodhand* 26 Md. 95; *In re Jackman* 26 Wis. 104; *Alltmon v. Pigg* 82 Ill. 157; *Baldwin v. Parker* 99 Mass. 85: *Boyse v. Rossborough* 6 H. L. Cas. 2; *Rabb v. Graham* 43 Ind. 1; *Parfitt v. Lawless* 2 Pr. & Div. 462; *Pierce v. Pierce* 38 Mich. 413; *Latham v. Udell* id. 238; *Wallace v. Harris*

32 Mich. 398; *Harring v. Allen* 25 Mich. 508; *Blanchard v. Nestle* 3 Den. 37; Redf. Wills 526.

COOLEY, J. The writ of error in this case brings before the Court the proceedings had in the circuit court for the county of Wayne on the probate of the will of Emilie Campau, late of the city of Detroit, who had died March 25, 1881. The will with a codicil thereto had been duly probated in the probate court for Wayne county, and the contestants had appealed to the circuit court, assigning as the sole reason for appeal, " that the said will was obtained by undue influence exercised upon said testatrix." The trial in the circuit court occupied the attention of that court for seventeen days, and resulted in a verdict sustaining the will. The contestants assign for error eighty-seven rulings on the admission of evidence, twenty-five refusals to instruct the jury as requested, and twenty-four instructions actually given or remarks upon the evidence. Most of the exceptions appear to be relied upon in this Court, and will be considered so far as they seem to have importance.

The trial judge in his charge to the jury gave a personal history of Miss Campau, as it was disclosed by the evidence, and as this summary was objected to in some few particulars only, it may be assumed to have been in other particulars correct, and it is accepted as such in the statement which follows. It appears from this that Miss Campau was a daughter of Barnabas Campau, Senior, an old French resident of Detroit, who died about the year 1845 leaving a considerable estate which he divided by will equally among his four children, Alexander M., Barnabas, Jr., Emilie and Angelique. The mother, who was of another French family, the Cicottes, had died before he did, and Angelique was married to Charles Piquette. At an early day, but exactly when does not appear, Emilie went to reside with her sister Mrs. Piquette, and continued to reside with her after the father's death until the sister herself died as hereinafter stated. Two boys named John and Charles L., were born to Mrs. Piquette after her father's death, and two girls,

Elise and Emilie. Mrs. Piquette's husband appears to have died early : the date is not important.

Miss Campau is described by the witnesses as a feeble and somewhat sickly person from her earliest days, but the full significance of these terms, as they make use of them, it is difficult to gather. It is plain, however, that as a child she was not as strong as an ordinary child of her age, and that as a woman she was not as strong as an ordinary woman of her age. She was tall, and perhaps her somewhat slender and attenuated form, together with the fact that she was pale and sallow, may have given the impression that she was sickly, and sickly would perhaps describe her appearance to a person using ordinary language ; but she apparently was not in general sick in the ordinary sense of the term. At the same time she was not so strong physically as other persons commonly are.

Miss Campau went to school as other children did. Witnesses speak of having been in school with her from 1825 to 1828, when she appears to have been from sixteen to nineteen years of age. She learned to read and write, but how much more she learned we are not informed. The intimations in the evidence are that she was backward in her studies, and that she was favored somewhat by her teacher on account of her poor health. All the evidence tends to show that she was timid and shy in the extreme, and hesitated to meet strangers, and this continued to some extent through life. One of the witnesses for the contestants, who perhaps knew as much of her as any one except the immediate family of her sister, describes her as a recluse who did not seem inclined to talk much and did not talk much and did not visit, or go into society, or attend public entertainments. She was a pious lady, and devoted to her church, which was the Catholic.

The Piquettes, together with Miss Campau, lived in Springwells, adjoining Detroit, a number of years ; afterwards they moved into Detroit and occupied a house on Jefferson avenue next to that of Judge Moran, where they lived ten or twelve years. They then moved across the way

into a house known as the Beattie or Field House. In 1870 Elise Piquette was married to Major Mitchell of the United States army, and for a time lived with him at Fort Washington, but he resigned his commission after a time, and brought his wife to Detroit, where he entered upon the study of the law occupying while doing so an office adjoining that of Mr. Levi L. Barbour who will be further mentioned hereafter.

In 1872 Mrs. Piquette died. In 1874 Emilie Piquette went to Europe under the protection of Governor Baldwin, expecting to meet a lady friend who was then there. In the spring of 1875 Major Mitchell was advised by his physician to take a trip to Europe for his health, and he and his wife decided immediately to go. When this decision was communicated to Miss Campau, she said at once, "Why can I not go with you?" When Mrs. Mitchell went to Miss Campau's rooms a day or two later, she found that preparations by her aunt to accompany them were already under way. Before this time John Piquette had died, and Charles L. Piquette had married the lady who is now one of the contestants, and had taken his wife to Europe. This last event seems to have taken place in May, 1874, and Miss Campau, if she had remained at home, would have been unattended by any of the family.

Major Mitchell and his wife, (she being one of the proponents of the will) left for Europe in March, 1875, taking with them their two children. Miss Campau went with them, taking along Mrs. Duggan as attendant and companion. They landed in Liverpool, where they remained a few days for rest, and where Miss Campau and Mrs. Duggan drove about together to see what they could see from the carriage. They then went on to London, where they remained several days, and from there they went to Paris. In Paris they met Emilie and her friend who had apartments together, while the Mitchells and Miss Campau had apartments in another part of the city. There Miss Campau remained until April, 1876, and Mrs. Mitchell also most of the time, though she seems to have made a visit in the mean time to Switzerland and Italy.

While the Mitchells and Miss Campau were on their way to Europe, Charles L. Piquette and his wife passed them on the ocean, returning. In the fall of that year Charles and his wife went back, and joined the Mitchells and Miss Campau in Paris the latter part of December. In April the Mitchells and Miss Campau returned to Detroit, leaving Charles and his wife in Paris, where they remained until July or August following, when Charles died, and his wife immediately returned to Detroit with his body. Two children had been born to Charles previous to his death, only one of whom survived him. Another was born the following December.

In July, 1876, Miss Campau had a somewhat serious illness, and was attended for a number of days by Dr. Morse Stewart. About that time she determined to make her will which she seems to have had in contemplation before, and to have spoken of her intention to some persons. Mr. Levi L. Barbour had transacted some business for the Mitchells before they went abroad and while they were absent, and she sent for him to consult him on the subject. Previous to this time Mr. William B. Moran had been acting for Miss Campau, and her papers were in his hands; but Miss Campau with the aid of maps and memoranda was able to give descriptions of her property, and after several conversations a will was drafted which was afterwards copied and executed. The description of one or two parcels of land was not accurate, but the errors were perhaps not important. The date of this will is August 17, 1876, and it was witnessed by Mr. Barbour and Dr. Stewart. By it she gave property valued at $30,000 in trust for Thomas S. and Albert Campau; about $25,000 to Alexander M. Campau; about $5000 to Mrs. Duggan, and the remainder, in three equal shares, was given to the two daughters of her sister and the children of her deceased nephew Charles. There were also gifts of $500 each to the Catholic organizations known as the Sisters of Charity, the House of Providence, and the Little Sisters of the Poor. Mr. Barbour was named executor, and with him was associated Francis P. B. Sands,

of Washington, D. C., in the expectation, as the will states, that he was soon to marry Miss Emilie Piquette. This expectation was fulfilled soon afterwards.

The body of Charles L. Piquette was brought to Detroit shortly after this will was executed. It seems that the marriage of Charles had been somewhat hasty and private, and that none of his family knew the lady except his sister Emilie, who had barely been introduced to her. The bride was not French and not a Catholic, but Miss Campau when she was presented, greeted her kindly, and as Mrs. Piquette who testifies to the interview, says: "I told her I was not a Catholic, but I would do my duty by Charles Piquette, and she said, 'I know you will.'" Miss Campau also greeted her kindly on her return from Europe on this last occasion.

For some reason which is left wholly to conjecture, for the evidence does not tend to explain it, Miss Campau soon decided to make a new will. She sent for Mr. Barbour and had several consultations with him on the subject, and according to his evidence he took from her full memoranda for the purpose, and after considering these in detail with her, drew a will which he left for her examination. This in some particulars was not satisfactory to her, and he drew another, which she finally executed October 26, 1876. The property which the will undertakes to dispose of is supposed to be of the value of $150,000. The important changes made by it from the first testamentary disposition are that it reduced considerably the gifts to the children of Charles L. Piquette, and increased those to Mrs. Sands and Mrs. Mitchell. That this will was executed with full understanding and deliberation is testified very strongly and clearly by Mr. Barbour; and Dr. Stewart, who witnessed it with Mr. Barbour, is equally clear that the will was executed with full capacity. Mr. and Mrs. Sands, Mrs. Mitchell and Mr. Barbour were named in the will as executors and trustees.

After the marriage of Mr. and Mrs. Sands, Miss Campau and Mrs. Mitchell—then a widow—followed them to

Washington, and took apartments at the Ebbitt House.
Mrs. Duggan and the children of Mrs. Mitchell accompanied them.  In the summer of 1877 they went for a time
to Atlantic City; the next summer they went to Sweet
Springs, Virginia; in 1879 they went to Coburg in
Canada and in 1880 to Deer Park.  At Deer Park Miss
Campau had a shock of paralysis, from which she recovered
wholly or partially and returned to Washington.  She had
another attack in January, 1881, from which she never re-
covered, and she died March 25, 1881.  In January, 1879,
she had executed at Washington a codicil to her will,
which was witnessed by James Hoban, Mary A. Long and
Mr. Barbour.  By this codicil a farm in Washtenaw county
and $8000 in cash were given to Alexander M. Campau in
lieu of the gift to him before made, and a change was made
in the devise for the benefit of Thomas S. and Albert
Campau, to provide for a mortgage which Miss Campau had
given.  The due execution of this codicil is testified to by
Mr. Hoban and Mr. Barbour.

Such is a brief summary of the life history of this lady
as the circuit judge gathered it from the evidence.  It
should be added, as contestants attached much importance
to the fact, that Miss Campau all her life-time made use of
an amanuensis for her correspondence, as well that of a
family as of a business nature, and that she is not shown to
have made much use of books at any period of her life.
When it is further stated that Mrs. Mitchell by a second
marriage has become Mrs. Hoban, we have perhaps suffi-
ciently completed the family history so far as it has im-
portance in this controversy.

That the prima facie showing on behalf of the will and
codicil is very full and complete is scarcely open to ques-
tion.  When the case was given to the contestants they
directed their attention at once to the question of testamen-
tary capacity, and they called witnesses by whom they un-
dertook to show that Miss Campau had never been men-
tally competent to manage her own affairs; " that from birth
she was feeble in body and stunted in mind, necessarily,

from the mere absence of communication with her fellow-creatures;" that "she was practically under guardianship all her life,—first, under that of her sister and then under that of her niece;" that "actual letters of guardianship were not necessary to obtain the care of her person or property, or to prevent waste, all this being secured without letters, and the troublesome necessity of accounting being avoided;" in short, that from lifelong defect of will and intellect she was incapable of a testamentary act, and was of necessity a mere puppet in the hands of others.

Whether it was competent for the contestants to go into evidence to disprove testamentary capacity under the issue made by them for the circuit court, is a question which seems not to have been made in the circuit court, and will therefore not be discussed now. The statute (Comp. L. § 5219) requires the party appealing from the probate court to assign the reasons for his appeal; and the sole reason assigned in this appeal was "that the said will was obtained by undue influence exercised upon said testatrix." Under that allegation it was undoubtedly competent to show weakness of intellect and feebleness of will, because these are commonly the conditions of undue influence; but that the contestants might go further and dispute testamentary capacity after restricting their appeal as is above shown, is a question upon which, under the circumstances, opinion is reserved. A summary of the evidence given for the contestants on the point of capacity is here given, so far as is needful to show its bearing and tendency.

*Dr. Samuel Truedell* was the first witness. He gives us to understand he was a family friend; a claim, however, for which little support is found in his evidence. He saw the decedent four or five times in all; the last time being some twenty years before the will was executed. He never had more than a few words with her, but was impressed with her weakness of intellect. Two occurrences in particular seem to have influenced his judgment of her mental powers. One was when one morning he came upon her unexpectedly in the house when her toilet was incomplete, and she ran and hid herself; and the other when,

being ill in bed at the time of a call made by him upon the family, she said immediately without waiting for any question, "I am better," and turned her face away from him. It was this last occurrence that especially impressed the doctor unfavorably, and he does not think Miss Campau was capable of dictating a will, or of doing any difficult business. The premises given seem very narrow for so broad a conclusion. The doctor never visited Miss Campau, professionally or otherwise; he never prescribed for her; but possibly she may have feared he was proposing to do so when she turned her head away so promptly and with so pointed an intimation that medical aid was not needed. In that case the act would have indicated will, even if wanting in wisdom. On his cross-examination this witness gives very strong if not conclusive evidence that his real opinion concerning her capacity was not at the time so low; for he testifies that at one time as justice of the peace he took and certified the acknowledgment of a deed executed by her, and this, as an honest man, he would never have done had he deemed her mentally incompetent.

*J. B. Delisle* had seen the decedent in 1856 and again in 1868. On the first occasion she signed a lease for him, which he seems not to have been afraid to take, and on the second he endeavored unsuccessfully to make a purchase from herself and her sister. Mrs. Piquette, we are informed, was willing to sell, but after Miss Campau had said to her a few words in a voice so low that he did not distinguish the words, Mrs. Piquette informed him that her sister refused to sell. Mr. Delisle "judges" from what he saw, that Miss Campau was incapable of transacting business in relation to property; a very singular judgment in view of the fact that she actually did transact business in relation to property on both occasions, and on the second exercised a controlling mind in respect to the matter in hand, not only for herself but for her sister.

*Josette Conner* went to school with Miss Campau when they were girls, and last saw her forty-four years before the will was executed. She testified that Miss Campau as a girl was timid and sedate,—not as lively as others; that she

answered questions sometimes, but appeared sickly and left conversation mainly to her sister. She got along with her studies apparently with some indulgence, was kind to her friends and was liked by them. The witness did not think her competent to do business, but she states no fact which can lead anybody else to that conclusion.

*E. C. Abbott* saw Miss Campau twice, the last time apparently being prior to 1842. On the first occasion the witness had gone to Mr. Piquette's to take "refreshments" with him. The refreshments he took there, we are told, were sometimes cider and sometimes "a little good old whisky." He thinks on that occasion the refreshments were not yet brought in. Mr. Piquette was about to give him an introduction when she turned right about and left the room, so that he did not speak to her at all. If Miss Campau knew what he was there for—as there is reason to infer from his evidence that she did—her conduct might have been somewhat impolite, but the indications of sense in it are unmistakable.

*Alexandrine M. Willis*, mother of Thomas S. and Albert Campau, testified to having been acquainted with Miss Campau from her youth. She speaks of her as having been always an invalid, very nervous and very shy, seldom going out except to church, very generous in gifts and very pious. Mrs. Willis had taken part with her in business transactions, especially in the partition of valuable lands, which she thinks Miss Campau understood, and would not have hesitated to take a deed from her. The following is an extract from the cross-examination of this witness.

"*Counsel.* Mrs. Willis, do you wish to be understood, from your knowledge of Miss Campau, that you would not have accepted a deed from her of a piece of property?

*Witness.* I think generally I would have accepted.

*Counsel.* Now Mrs. Willis—

*Witness.* Although I want you to understand that I do know there is a very great difference between a deed and a will.

*Counsel.* No doubt.

*Witness.* A will is very different.

*Counsel.* Then you think she might have had capacity to

execute a deed and understand it, but not a will. Is that right?

*Witness.* Yes sir. It does not involve anything like a will. I think she could have understood that."

It is very evident it is not the case of the contestants that is supported by this testimony.

*Sylvester Larned,* who was born in September, 1820, and was therefore ten or eleven years younger than Miss Campau, went to school with her and had an acquaintance which ceased when he was in his fourteenth year. As he remembers her when he was six or seven years of age "she was in many respects the direct opposite of her sister Angelique both in person and in mental faculties; the one being very bright,—Angelique,—the other very infirm and a kind of clouded and obscured intellect; an infirm intellect I would rather say." He had seen her in Labbie Campau's store, and when persons would come in who were strangers she would exclude herself, draw aside; would go into another room, and if we children were playing together, she would not join in our plays; she was exceedingly quiet, talked but little, and had a very singular peculiarity of hanging down her head." She seems to have got along with her lessons in school, though her scholarship was poor; and the witness gives us his deliberate judgment, which he had from his sixth year to his thirteenth, inclusive, to form, that "from my knowledge of her capacity I did not deem her at the time that I knew her, competent to make a will, or to make this will." This application of the very clear but somewhat precocious judgment to the particular will in controversy is deprived of some of its force by the subsequent concession of the witness that perhaps Miss Campau, during the forty-seven years when he had not known her, might have acquired due capacity; and possibly the jury might not have been so strongly impressed as the witness was with the evidence of a "clouded" or "infirm" intellect afforded by the want of interest of a young woman of sixteen or eighteen in the plays of boys of six or seven.

*Louis Cicotte* testifies to nothing of importance except that in making a purchase of land from Miss Campau and

Mrs. Piquette, Miss Campau said she would do in respect to the trade what her sister did.

*Catharine Sanders* was nurse for Mrs. Piquette during her last illness. She had not known Miss Campau before, but saw her there three times, but did not hear her speak until she took leave of her in going away. The first time Miss Campau sat "scrooched" down upon the stairs with a calico garment on and her face to the wall; the other two times the witness merely saw her come into the room. To say that one is "scrooched" down, as we infer, is to express in somewhat contemptuous language the idea that one has sat down without proper regard to dignity of appearance; and this or the calico dress, or something else not explained, but which was certainly nothing said by Miss Campau, so impressed this woman that she informs us "from my knowledge she did not look like she had sound senses." The only conversation that took place between them is then given by the witness. After Mrs. Piquette had died, the witness went to Miss Campau's room to bid her good-bye. "I told her I was going. 'Oh,' she says, 'stay.' I said, 'No; I must go.' 'Well,' she says, 'stay another month;' and I said 'No; I must be going home;' and she said nothing more." Nothing unnatural appears in this; nothing indicative of the absence of "sound senses."

*H. N. Brevoort* testified to having gone at one time to take Miss Campau's acknowledgment of the execution of a deed, and to having certified to it "through Miss Emilie Piquette," without seeing the grantor or having any personal communication with her. The unfavorable deductions from this evidence affect the officer rather than the party. We can understand a woman in sickness, or from mere personal convenience, requesting another to act for her in such a case if she supposed it admissible; but how the officer, who of course knew better, could consent to make the untrue certificate, is not so readily understood.

*Theodore G. Williams* testified to having transacted a large amount of business as the agent of Miss Campau, and to having paid out for her over $50,000. The business was transacted through Mrs. Piquette or Charles Piquette, and

when he went to the house he did not ask for Miss Campau herself. Nothing in his evidence, however, indicates that he did not consider Miss Campau competent while he was acting as her agent, and he at one time asked of her an important business accommodation, which we cannot for a moment suppose he would have solicited from any one not fully competent to judge what was for her interest.

The contestant *Fanny E. Piquette,* now by a second marriage Fanny E. Van Dyke, gave an account of her friendly relations with Miss Campau in Detroit, Paris and Washington. Miss Campau, as she shows, was tenderly attached to her first husband, to whom she gave " a handsome chest of silver " on his marriage, and she was also fond of his children for whom the contestant is now acting. One purpose of taking her testimony would seem to be to show that Miss Campau might naturally have been expected to make these children the objects of her bounty. Mrs. Van Dyke speaks of Miss Campau as a kindly woman, feeble in body and intellect, and who once, when she had dyspepsia, sobbed and acted like a child because they would not let her have the food she wanted. The witness owned a one-twelfth interest in Belle Isle, near Detroit, and joined the other owners, including Miss Campau who owned a fourth, in selling it to the city of Detroit for $200,000, and it did not occur to her at the time, or when they united in a lease of fisheries, that there was on the part of Miss Campau any want of competency. Both the sale and the lease were later in date than the codicil to the will.

*E. V. Cicotte* testified that in his opinion Miss Campau was incapable of executing with proper intelligence the will in question. He had not seen her except, perhaps, to bow to her for thirty years before her death, and he testifies to nothing within his personal knowledge as constituting a basis for his opinion, except an impression derived from observation that in health she was feeble, and in mind below the standard of ordinary women.

Such was the evidence introduced by the contestants to show want of testamentary capacity. Much evidence was

given by the proponents in rebuttal, some of which was
taken under exception, and the trial judge gave instructions
on this branch of the case of which the contestants com-
plain.　If the evidence for contestants shows, or fairly
tends to show, a want of capacity, they were entitled to
take the sense of the jury upon it; but if they produced
no evidence which tended to meet and rebut the case made
for the proponents, and which, standing by itself, would sup-
port a verdict in their favor, it is very plain that they could
not have been injured by any rulings against them on this
branch of the case.

So far were the contestants from meeting the case made
by the proponents, that they gave it support by nearly every
witness.　We see in their evidence the picture of a lady,
never strong in body and at times decidedly an invalid,
kindly in manner, generous to friends, but shy and reserved
in the presence of strangers, reserved in her conversation
and without a taste for literature or public amusements,
who lived a long life of quiet goodness in the practical
assertion of equal legal rights and powers with others, and
passed away without the question of her legal equality
being ever made.　She had a considerable fortune, which
came from her father, and the trial judge remarks upon it
as an important fact in the family history, that while the
father by his will appointed trustees for the estate given
to Mrs. Piquette, he seems to have made no such provision
in the case of the property given to Miss Campau, but left
it without restrictions to her disposal.　It remained at her
disposal for thirty-five years or more; she had in respect to it
large business transactions; she appointed in succession
three business agents; she made deeds and leases which no
one hesitated to accept, and she made numerous gifts.　The
last important transaction was with the city of Detroit,
and required a payment to her of fifty thousand dollars,
and we hear of no question being made respecting the
propriety or legality of the payment.

These facts do not tend to show incapacity; they show
the reverse most distinctly and unmistakably.　Only a per-
verse or a misguided jury could have found for the contest-

ants upon them. The physical weakness which was shown, the nervousness and reserve, and the disinclination to make use of the pen, prove by themselves nothing to the point, for they are perfectly consistent with great mental powers, and are sometimes met with when such powers unquestionably exist. But if it be conceded that this woman was below the mental capacity of average women, which is all that the evidence tends to prove, the case for contestants is still far from being made out. There is no rule of law which prescribes average capacity for a testamentary act; if there were it would disable a large portion of every community; perhaps one-half of it.

No witness for the contestants ventured to say that Miss Campau was an idiot. No one expressed the opinion that she was insane. No one said her faculties were impaired by old age. No one thought her incapable of dealing in property by deed. The conclusion of the whole matter as respects capacity is best given by Mrs. Willis, who, while conceding the competency to make a deed, denies the competency to make a will. "That," she informs us, "is different."

There is probably little doubt that this remark embodies an opinion, or at least an impression that is far from being uncommon. It is an impression for which the law is not accountable, though the manner in which the law is sometimes used and abused may give it some countenance. In law one who is competent to deal in property on the basis of contract is competent to dispose of property by will. With surviving relatives there is often a very different rule; and persons who have gone through an active life with business competency unquestioned, are denied testamentary capacity the moment a will is produced which does not meet the desires or expectations. Something will then be brought forward to show that the testator was, as respects the particular act, an imbecile. He was perhaps below the general average in intellect, or he had some idiosyncracy which, when presented in the proper light, may be thought to resemble or to indicate insanity, or there was a taint of insanity in the family blood, or something in his history

was so peculiar or mysterious as to afford ground for a hope that if properly handled a jury may believe or imagine or guess there was something wrong about him, and refuse to sustain the will. The grounds for a contest are as likely to be found in the case of a man of strong mind as any other, if he had his peculiarities, as most such men do. *Fraser v. Jennison* 42 Mich. 206. But they would be abundant in the case of a lady like Miss Campau, as the enormous record of over seventeen hundred printed pages conclusively shows. The simple, kind, reserved, domestic, benevolent and pious lady while living, becomes the imbecile as soon as her will is opened. But the law regards her case with different eyes. If she could buy and sell, and give deeds and leases, and make gifts by delivery, she could make gifts by will also.

We have not commented upon the fact, which of itself would be conclusive against the case of the contestants, that not one of the witnesses who ventures to express an opinion against the mental capacity of Miss Campau, pretends to base the opinion upon personal intercourse or observation had or made within twenty years of the time when the will was executed. The witness Sanders might be considered an exception if the opinion she expressed, when taken with the grounds for it, were not so manifestly preposterous. A woman even though wealthy may wear a cheap garment in the privacy of her own home if she pleases, and she is not to be judged as to "sound senses" on two casual views of her face, even though she does, when some great calamity is impending, like that of the death of an only sister, seat herself upon the stairs with her face to the wall. Some of the evidence it is difficult to treat with seriousness; and one might suppose that the circuit judge, fatigued with the long trial, admitted it from a sense of humor and by way of recreation and relief. This is particularly the case with the evidence of Mr. Larned, who at the ripe age of sixty-two gives to court and jury the sage criticisms he mentally made of the powers and capacities of his elders at that period of life when others of corresponding age would be just entering upon easy lessons in reading and spelling. If Miss

Campau could be supposed to have known that she was being made the subject of such profound judgments by youthful critics on the one side, and such summary judgments by strange nurses on the other, her shyness, and hanging down of head, and avoidance of human society would not seem so mysterious or so unreasonable as it appears to contestants now.

If there were any pretense that the evidence tended to show idiocy, it would not be so important that the witness did not see the decedent in her later years; for an idiot is not supposed to acquire capacity in the lapse of time. In this case idiocy is not only not pretended, but is disproved by the contestants. What they claim is that Miss Campau was mentally weak and feeble; and this they attribute to the lack of bodily vigor and health. Imbecility of mind from such a cause might pass away; and evidence concerning it ought to be directed to the time when the act was done which made the mental state important. Such was not the case with the evidence given on behalf of these contestants. The witnesses who knew Miss Campau in her later years bore testimony to her capacity. But it was not needful, because the capacity was not successfully assailed.

The other branch of the case concerns the alleged undue influence. The charge, as has been said, imputes the wrongful influence to Mrs. Mitchell, now Hoban. As complaints are made of the rejection of some evidence by the court, it will be proper to consider the case as it would have stood if contestants had given all the evidence they professed to offer. It would then have appeared that by reason of Miss Campau's residence with her, and her very quiet and reserved habits of life, Mrs. Mitchell had every opportunity to reach Miss Campau with selfish and improper influences; that she was made a medium in Miss Campau's business communications with agents; that the business agent of decedent was changed, and the same person employed who had before been agent for Mrs. Mitchell; that Mrs. Mitchell was aware of the contents of the two wills contemporaneously with their execution, and did not dis-

close their contents to others ; and that she paid the legacy of $8000 to Mr. A. M. Campau, who thereupon took a trip abroad, instead of staying to contest the will, as he was expected to do. All these things, taken severally, seem innocent enough. It was certainly not improper for Mrs. Mitchell to pay A. M. Campau the money which she conceded was his of right; and if he was in fault for going abroad afterwards, she was not to be blamed for it, unless she was in some manner connected with or responsible for his going; and of that there was no evidence whatever. Moreover, Mr. A. M. Campau or any other member of the family was under no obligation, legal or moral, to take part in such a litigation ; and if he purposely turned his back upon it, a presumption of good motives may very properly arise in his favor. If Mrs. Mitchell knew the contents of the two wills and failed to disclose them, she may well be excused for doing so, irrespective of any desire the testator may have expressed to that effect. The family quarrel over testamentary dispositions comes soon enough if it is postponed until the person making them has been decently laid in the grave. There was not a particle of evidence that Mrs. Mitchell or any one else actually did influence or attempt to influence the making or altering of a will by Miss Campau, or that she had anything to do with the employment of Mr. Barbour to draft the will, or for any other purpose, or that she resorted to any trick or artifice to keep friends or relatives of Miss Campau away from her, or that any of them were kept away, in fact, or that the will and codicil, as drawn, represented anything else than the desires of the decedent, deliberately formed and carefully dictated by her to the scrivener. What contestants can forcibly urge on the facts is that Mrs. Mitchell had every opportunity for abusing her aunt's confidence ; but if we were to suspect improper conduct whenever there was opportunity for it, nobody could be secure against suspicion at any time. But ground for suspicion and ground for judgment are very different things. Judgment must be based upon evidence, and of evidence of undue influence there was none in this case.

The judgment sustaining the will I think should be affirmed with costs.

The other Justices concurred.