[Civ. No. 7557. Second Appellate District, Division One.—December 18, 1930.]

In the Matter of the Estate of ARTHUR WHITWORTH, Deceased. ROBERT G. WHITWORTH et al., Appellants, v. M. J. OLIVAS, Executor, etc., et al., Respondents.

C. L. Kilgore and Duke Stone for Appellants.

Byron J. Walters and Ralph K. Pierson for Respondents.

HOUSER, J.—This is an appeal from a judgment of nonsuit in a proceeding by which the probate of the last will of the deceased, Arthur Whitworth, was contested.

The only matter in controversy between the litigants herein relates to whether the evidence introduced on the trial of the contest was sufficient to require the submission to the jury of the question of the mental capacity of the testator to make a will.

The substance of the evidence adduced on the hearing of the contest was that the testator was ''feeble minded, . . . weak minded; . . . an immature individual; . . . of unsound mind; . . . silly; . . . had the mentality of a boy not over ten

---

3. See 26 Cal. Jur. 638; 28 R. C. L. 97 (8 Perm. Supp., p. 6087).

years''; he had ''a silly expression on his face; acted like a half-wit''. That as a boy, although he had attended school for a period of ''seven or eight terms'', he could read very little; ''could not read very good''. He read the ''Hollywood News''; could not spell and could only write his name. He would answer questions, but he could not carry on a connected conversation; ''his answers would be incomplete and meaningless and vague''. He was ''easily peeved, without cause''. That his hands were deformed; ''one hand just like a chicken foot''; ''he was born with part of his fingers and thumb off; some of his fingers were webbed together; . . . one hand the thumb was off right here, and his first two fingers, and on the other hand he had the little finger and this finger and thumb, but the thumb was flat''. He would meet a stranger and look at him with a kind of grin. He did light work about the ranch, such as feeding the horses and cows; he was not capable of doing heavy work. ''He would pitch hay into the horse manger, but never went out into the field to pitch hay . . . he could drive two horses along very well, but he could not handle more than that; he did not know how to take hold of a six-horse team and plow. He worked in the hay crop during the hay season. . . . He stayed around the place and worked on the ranch in general, like we all did, took care of the barn, took care of the stock, the horses.'' That for a period of about ten years next preceding his decease, he lived with a man named Olivas, where he had a chicken ranch, and also ''watched cattle''. When he visited either of his brothers, he would say, ''I will have to get back to Olivas to take care of the chickens''; or, if he were to remain overnight at the home of either of his brothers, if he so chose, he would sleep in the barn, although he might have occupied a bed in the house. At the time when he started going with Olivas (''as a guess'') his estate might have been worth thirty or forty thousand dollars in mortgages and lots; but at the time of his death he was worth between five and six thousand dollars. Although at that time he had $140 in cash, only bread and coffee were found in the place where he had lived. Sometimes one of his brothers would give him $10 or $15 or $20. That he was incapable of attending to his own business; although he ''carried a bank account and checked

against it when he needed money". He also negotiated "a deal for the job of painting the ranch house". He had some money out at interest. He also owned and managed other properties. That before the Great War one of his brothers, who was an attorney at law, cared for his business interests for him; that he had some cattle, and if he needed a little money and someone came along and offered him any price, "he would be willing to sell it at a sacrifice"; that he would give his money away. "He gave a barber lady enough money to buy a ranch." When an application for letters of guardianship was made for his person and estate, "he stated that if we had a guardian appointed he would kill himself". On occasions when he "went anywhere into town", on his return, if one of his brothers were to inquire where he had been, he would answer, "Huh, what do you want to know for?" And if his brother were to reply that he did not wish to see him throw his money away, he would say, "What is it to you? It ain't your money." When another brother of the testator would try to ask him about his business affairs, he "never got very far with it". The testator would not answer the questions, but would tell him "it was none of his business".

From the foregoing summary of the salient points of the evidence introduced on the hearing of the contest, it may be deduced that the testator was not possessed of the average amount of human intelligence; or, as expressed by one of the witnesses, "he was a feeble minded, or a weak minded, individual", who, perhaps unsuccessfully, attended to his own personal and business affairs.

In its facts the case of *Howell* v. *Taylor,* 50 N. J. Eq. 428 [26 Atl. 566, 567], presented a situation somewhat resembling that in the instant case. Therein it unquestionably appeared that the testator was weak-minded. "He could read and write his name, and, at times converse with some show of intelligence. He also could work in the garden, and aid in harvesting and perform household errands. As to the extent of his capacity to do errands the witnesses differ. Some say that he would indicate that for which he was sent by a single word, or would deliver a slip of paper upon which the name of the article was written, while others testify that he possessed sufficient intelligence to be able fully to state what he wanted, and to

pay for that which he obtained. It is also testified that sometimes he would sit listlessly for hours, mumbling and laughing to himself. His expression was vacant; yet, as one witness, a clergyman, says, there was more intelligence than idiocy in it. His articulation was indistinct, and could scarcely be understood by one unaccustomed to it. He rarely answered when spoken to, except by a monosyllable, but his answers were correct. He was docile, never rebellious, and so well-behaved that he ate with the family, and remained clean and decently dressed. The income from his estate was usually paid to some member of the Taylor family, upon his signing a receipt for it; yet it is in evidence that at times he had and kept possession of sums of money himself, and discreetly disbursed them. It was not affirmatively and clearly proved that he ever asked or knew about his estate, or that he was able to recollect his kindred, but, at the same time, *it was not shown that he was without that knowledge and recollection.* By inference it may be gathered that he had some comprehension of his property, and some remembrance of his relatives, who were numerous. He certainly could remember the Taylors and his obligation to them. The order of his intelligence was undoubtedly low; yet it is impossible to say that under favorable circumstances, existing at the very moment of making the will, he did not possess that 'moderate' capacity which is recognized by the court of errors and appeals in *Waddington* v. *Buzby,* 45 N. J. Eq. 173 [14 Am. St. Rep. 706, 16 Atl. 690], as sufficient to validate such a paper.''

Other cases where the imbecility of the testator was the issue involved in a contest of his will, and in which a low degree of mentality was shown to have been present, but in each of which the will was upheld, are: *Errickson* v. *Fields,* 30 N. J. Eq. 634; *Hoban* v. *Piquette,* 52 Mich. 346 [17 N. W. 797]; *St. Joseph's Convent of Mercy* v. *Garner,* 66 Ark. 623 [53 S. W. 298]; *Bennett* v. *Bennett,* 50 N. J. Eq. 439 [26 Atl. 573]; *Bannatyne* v. *Bannatyne,* 14 Eng. L. & Eq. 581.

In all the cases in which the question of the soundness of mind of the testator is involved the inquiry is limited to a determination of whether at the time of the execution of the will the testator was possessed of testamentary capacity. Nor is such capacity dependable upon a fixed standard of mentality in the testator; not even such as might be

rated as an average is demanded. As is remarked in *Hoban v. Piquette,* 52 Mich. 361 [17 N. W. 797, 804]: "There is no rule of law which prescribes average capacity for a testamentary act; if there were it would disable a large portion of every community; perhaps one-half of it." ▪ The rule in California, which has been frequently announced by the courts of this state, is: "A testator is of sound and disposing mind and memory if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property and to remember, and understand his relations to, the persons who have claims upon his bounty and whose interests are affected by the provisions of the instrument. (*Estate of Motz,* (136 Cal. 558 [69 Pac. 294])', *supra; Estate of Dole,* 147 Cal. 188 [81 Pac. 534]; *Estate of Huston,* 163 Cal. 166 [124 Pac. 852]; *Estate of De Laveaga,* 165 Cal. 607 [133 Pac. 307]; *Estate of Casarotti,* 184 Cal. 73 [192 Pac. 1085].)" (*Estate of Sexton,* 199 Cal. 759, 764 [251 Pac. 778, 780].)

▪ In the contest of a will where the issue presented involves the testamentary capacity of the testator, the outstanding presumption is that the person who executed the will was sane and competent to make such an instrument, and the burden rests upon the contestants to prove otherwise. (*Estate of Perkins,* 195 Cal. 699, 703 [235 Pac. 45], and authorities there cited.)

▪ It would serve no useful purpose to herein consider the conduct, act by act, of the testator, or to attempt a comparison of his intellect with that of either a brilliant or an average mind. The primary questions which are to be given consideration are: Was he possessed of that mentality which enabled him to understand the nature and situation of his property; to remember and to understand his relations to those persons who would be the natural objects of his bounty; and did he realize the nature of the act which he was performing? But of at least equal importance with the determination of such facts is the solution of the further inquiry as to whether the contestants sustained the burden which was cast upon them to prove the negative of such facts. A search of the record herein discloses evidence from which it is clearly inferable that at no time was the testator failing in his knowledge with

reference to the nature, situation or extent of his property. Nor is there the least indication that he was not entirely cognizant of the existence of those persons who, on the death of the testator, ordinarily would be expected to share in his estate. He knew them; had business relations with them; and at all times engaged in friendly social intercourse with them. Far from carrying the burden of showing to the contrary, the evidence introduced by the contestants affirms the legal testamentary capacity of the testator by establishing facts vitally opposed to the ultimate conclusion necessary to a decision of the testator's incompetency. In such circumstances, no error was committed by the trial court in its order by which the motion for nonsuit was granted. (See text and authorities cited in 26 Cal. Jur. 764 et seq.; also Supplement to same, at page 1581.)

The judgment is affirmed.

Conrey, P. J., and York, J., concurred.