[Civ. No. 11843.   First Dist., Div. Two.   Jan. 26, 1942.]

Estate of ALVIN W. SHIELDS, Deceased.   ELEANOR LISERANY et al., Appellants, v. ADELINE OVALLE et al., Respondents.

Gus L. Baraty, Charles V. Barfield and Robert M. Davis for Appellants.

Alfred J. Hennessy and Alfred Voyce for Respondents.

DOOLING, J. pro tem.—This is an appeal by the contestants of the decedent's will from a judgment of nonsuit granted by the trial court on the issue of undue influence and a judgment notwithstanding the verdict on the issue of the unsoundness of mind of the testator at the time of the execution of the will.

The contestants are first cousins of the testator and his nearest living relatives. No provision was made for any of them in the will, the testator leaving his entire estate to the respondents Ovalle who are husband and wife and not related to the testator.

The will was executed on February 28, 1936. It was prepared by Alfred Voyce, an attorney at law, from directions given to Voyce a few days before by the testator when Voyce called upon the testator at his home where the testator was recovering from a serious attack of chronic bronchitis. Voyce was at that time the attorney for the testator in the admin-

istration of the estate of his deceased wife, and no one else was present at the time that the instructions were given for the preparation of his will. It may be remarked in this connection that while Voyce subsequently became one of the attorneys for the Ovalles as proponents of the will, there is not a scintilla of evidence that he was attorney for the Ovalles in any matter at the time of the execution of the will. He had at that time only met them casually, having been introduced to them by the testator a short time before. This is mentioned because of the claim advanced by appellants in their brief that the will was prepared by the Ovalles' attorney. The claim finds no support in the evidence and need not be further mentioned.

Appellants on the issue of the lack of testamentary capacity rely upon the evidence of Catherine Spencer and John Alvin Spencer her son as to the mental condition of the testator at a time prior to the execution of the will and upon the admitted insanity of the testator commencing about the month of August, 1936, as a result of which the testator was first confined in the Park Sanitarium, a private hospital for the treatment of nervous and mental cases, and later adjudged insane and committed to a state hospital where he remained until the time of his death, and upon the evidence of Dr. Gobar, a witness called by the proponents, as to the condition of the testator commencing in June, 1936, when Dr. Gobar was first called to attend him.

The evidence of the witnesses Spencer is to the effect that for a number of years prior to 1936 the testator had been a habitual drunkard, that at the time of his wife's death on August 25, 1935, he had been drunk and his house was filthy and full of fleas, that he remained so drunk that he could not attend his wife's funeral; that thereafter for a period of a week John Alvin Spencer took the testator for rides in his automobile, that the testator was always drunk on these occasions and had hallucinations that cars were coming up behind them when no cars were there, that Spencer was driving too close to the curb when such was not the fact and that he was endangering the safety of pedestrians when no pedestrians were present; that one night during this period the testator came to the Spencers' home, he was drunk and said he was afraid of the dark and they allowed him to spend the night with them; that during this period he was dishevelled, dirty, didn't shave and didn't take care of himself; he was a

changed man. John Alvin Spencer did not see the testator after August or September, 1935. During the period when John Alvin Spencer saw the testator after his wife's death he was always drunk or partially drunk, and during that period it was his opinion that he was not of sound mind.

Catherine Spencer's observation of the testator extended over a longer period of time. In 1933 when her husband died the testator was too drunk to go to his funeral, and for many months before he had been under the influence of liquor; about that time a change came over him and he attended to very little business; since 1933 the use of intoxicating liquors affected Mr. Shields mentally; he wandered around the streets much dishevelled, asking people for money. After his wife's death this witness saw the testator every other day or so for two months; his house was in a terrible condition; most of the time he was under the influence of liquor; when she spoke to him everything was so confused by him that she was hardly able to know what he was talking about; one day he was telling her about people coming in the back way, how cats had been bothering him getting in the window. Her visits continued until about December, 1935, and once in January, 1936, she saw the testator walking along the street toward a place where he used to buy liquor. He had pajamas on, one leg rolled up, bedroom slippers and an overcoat. It was her opinion that he was insane "because he was continuously under the influence of liquor" and of the other facts to which she had testified.

Dr. Gobar's testimony is here referred to because, while he was called as a witness for proponents, appellants rely on his testimony on this appeal to argue that it supports an inference that the testator was suffering from senile dementia at and prior to the date of the execution of his will. Dr. Gobar was called to treat the testator in June of 1936. He was suffering from sclerosis of the liver and had fluid in the abdominal cavity or dropsy. He was very weak and not competent to transact any business when the doctor first saw him because of his extreme illness. He made a good recovery and was sitting up part time in two or three weeks. He told the doctor that he had been drinking wine considerably before his sickness began. From the doctor's observation he testified that after the first stage of the testator's illness had passed he was of sound mind until about the middle of August, at which time he began seeing things, talked to his

father, mother, brother and aunt, all long dead, as if they were present. At that time he was suffering from senile dementia which is a depreciation of the brain tissue brought on in his case by sclerosis of the liver and arteriosclerosis. These are all progressive diseases which develop over a considerable period of time. The depreciation of the brain tissue may, however, in a terminal case develop very rapidly; "the brain holds up to a certain point and then through lack of nutrition it suddenly gives way . . . a case of this character goes a certain period, and then there is a sudden breakdown as a result of the groundwork having been laid before . . . and sooner or later some organ has to give. . . . In this case it happened to be the brain."

We approach the consideration of the effect of this evidence in view of the established rule that if the evidence produced would reasonably support the verdict of the jury it is error to grant a motion for a judgment *non obstante*. (*Estate of Nelson,* 134 Cal. App. 561 [25 Pac. (2d) 871]; *Estate of Arnold,* 16 Cal. (2d) 573 [107 Pac. (2d) 25].)

Taking the evidence of the witnesses Spencer as to the condition of the testator prior to the date of the execution of the will, it is to be observed that its effect was that the testator during the periods covered by their testimony was practically always drunk when they had seen him and when in that condition he was in their opinion not of sound mind. This was not enough to support an inference that at the later time when he executed his will he was either drunk or lacked testamentary capacity. (*Estate of Fisher,* 202 Cal. 205 [259 Pac. 755]; *Estate of Putnam,* 1 Cal. (2d) 162 [34 Pac. (2d) 148]; *Estate of Arnold, supra; Estate of Garvey,* 38 Cal. App. (2d) 449 [101 Pac. (2d) 551].)

It was said in *Estate of Fisher, supra,* at page 212: "Proof that decedent was 'incompetent' or 'insane' when so intoxicated that it was necessary to arrest him or upon occasions when, in the words of the witness, he 'only needed another drink to put him down and out' is entirely insufficient to show that decedent never enjoyed lucid intervals during which he was competent to execute a will. The witness himself testified that the decedent was not released from jail until sober and that he was not insane when sober."

In connection with the sentence last quoted, it is to be remarked that on cross-examination the witness Catherine Spencer testified that she was in court on the day that the

testator was appointed administrator of his wife's estate, she saw him sworn and examined, and he was not intoxicated that day, he was sober.

It is likewise said in *Estate of Fisher, supra*, at page 209:

"In the absence of proof that the intemperate use has actually destroyed testamentary capacity, no presumption will be indulged, however long continued the habit is shown to have been, that it has thus been destroyed."

And again on page 210:

"It (proof of a commitment for inebriacy) is not, however, even *prima facie* evidence that the use of alcoholic liquors has caused a permanent impairment of the mental faculties and a loss of self-control which persists after the temporary effects of the liquor have passed away, nor will it be presumed from the fact that the subject of the commitment was a victim of the liquor habit at the time of the commitment that such habit persisted thereafter. It is only in those cases where the mental disease has become settled that the mental disorder is presumed to continue."

In *Estate of Arnold, supra*, a much stronger case was presented for the contestant. There a physician who had treated the testator for a period of six years for being drunk over 200 times testified that when he saw him during that period he was always drunk, that he was suffering from chronic alcoholism and that he was of unsound mind. The court said of this testimony at page 585:

"He referred to Arnold drunk and not Arnold sober. This evidence falls far short of that required to prove that Arnold was mentally incompetent to make a valid will. In fact it is no evidence of the unsoundness of mind of a sober individual."

The evidence was that when the testator made this will he had not had a drink for several weeks, that he was sober and of sound mind. In view of the rules laid down by the cases cited, including those quoted from *supra*, this evidence of the testator's competency not only could not be overcome by the proof offered as to the testator's condition at a previous period, but even in the absence of such evidence of competency it would not have been sufficient to overcome the legal presumption that he was competent at the time that he executed his will.

Of the testimony of testator's condition after he executed his will appellants attempt to seize upon an isolated portion

of Dr. Gobar's testimony, that senile dementia and the other inducing ailments from which the testator suffered are progressive and the result of physical changes that take place over a considerable period of time, to argue that the testator must have been incompetent on February 28, 1936, at the time when his will was executed. This ignores the rest of Dr. Gobar's testimony completely. It will not do to wrench a fragment of the testimony from its context. Dr. Gobar's testimony above recited was that the testator was competent from a week or ten days after he first saw him to some time in August when the cumulative effects of his condition suddenly culminated in his becoming insane. "Insanity exists as a matter of law only from the time it is shown to exist and proof of subsequent insanity will not create nor carry a presumption of its past existence." (*Estate of Perkins*, 195 Cal. 699 [235 Pac. 45]; *Estate of Dolbeer*, 149 Cal. 227, 235 [86 Pac. 695, 9 Ann. Cas. 795]; *Estate of Finkler*, 3 Cal. (2d) 584, 595-6 [46 Pac. (2d) 149].)

It was not proved by any evidence that the testator when sober lacked testamentary capacity at any time prior to the date of the execution of his will, the only evidence on the subject was that at the time of its execution he possessed testamentary capacity and continued to possess it, except for a brief temporary incapacity caused by the extreme weakness brought on by a severe illness in June, 1936, until at least some time in August of that year. There being no evidence to support the jury's verdict that the testator was not of sound and disposing mind at the time the will was executed, the judgment notwithstanding, the verdict must be affirmed.

On the issue of undue influence it was shown that the Ovalles became tenants of the testator in September, 1935. They occupied the upper flat and the testator occupied the lower one in a building owned by the testator. They felt sorry for the testator and cleaned up his flat which was very dirty, kept it clean thereafter and used to prepare some of his meals. The testator took them for rides in his automobile. The Ovalles were not related to the testator and he had never known them before they rented his flat. Neither of the Ovalles was present when the testator directed Voyce to prepare the will nor when it was executed. Shields did not tell them that the will had been executed in their favor until the May following its execution. A cousin of Mrs. Ovalle was a wit-

ness to the will. Her testimony was that she was paying a friendly visit to the testator because he had been ill and he asked her to act as a witness to the will. There is nothing in this evidence to support a finding of undue influence.

"Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." (*In re McDevitt*, 95 Cal. 17, 33 [30 Pac. 101]; *Estate of Leahy,* 5 Cal. (2d) 301, 304 [54 Pac. (2d) 704].)

"In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 Pac. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt,* 95 Cal. 17, 33 [30 Pac. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will, and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 Pac. 828].) It is further held that mere opportunity to influence the mind of the testator, even coupled with an interest or motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal. App. 367, 371 [35 Pac. (2d) 614].)" (*Estate of Arnold, supra,* page 577.)

█ It is claimed, however, that the evidence showed that the Ovalles stood in a confidential relationship to the testator and this shifted the burden to them to show a lack of undue influence. We do not agree that such a confidential relationship was shown but conceding that it was this did not, standing alone, shift the burden to the proponents.

"In the *Estate of Baird,* 176 Cal. 381, 384 [168 Pac. 561], we find the applicable rule stated in the following concise language: 'As suggested in *The Estate of Higgins,* 156 Cal. [257] 261 [104 Pac. [6] 8], "presumption of undue influence" arises from proof of the exercise of a confidential relation between the testator and such beneficiary, "*coupled with*

*activity on the part of the latter in the preparation of the will.''* The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will'.'' (*Estate of Arnold, supra,* page 581.)

The claim that the will was unnatural in omitting to provide for contestants is equally unfounded. None of them had seen the testator since 1920 when they met at the funeral of a relative except for two or three chance meetings on the streets of San Francisco. They practically had lost all contact with one another for a great many years. They were all collateral relatives and not in any legal sense the natural recipients of the testator's bounty. (*Estate of McDonnell,* 109 Cal. App. 577 [293 Pac. 651]; *Estate of Nolan,* 25 Cal. App. (2d) 738, 742 [78 Pac. (2d) 456]; *Estate of Finkler, supra,* pages 597, 598; *Estate of Leahy, supra,* page 303.)

The fact that the will was prepared from directions given by the testator to his attorney when no one else was present is very strong evidence that it was the testator's voluntary act. (*Estate of Unger,* 188 Cal. 714 [206 Pac. 1003]; 26 Cal. Jur. 728.)

The judgments appealed from are affirmed.

Nourse, P. J., and Sturtevant, J., concurred.