[Civ. No. 16642. Second Dist., Div. Three. Jan. 20, 1949.]

Estate of MARY J. DOTY, Deceased. CALIFORNIA TRUST COMPANY, as Executor, etc., et al., Respondents, v. MERLE ARMSTRONG NIELSON et al., Appellants.

Samuel J. Crawford and Joseph T. Enright for Appellants.

Hector P. Baida, J. Leroy Irwin and Carvel C. Torrence for Respondents.

SHINN, P. J.—On May 9, 1946, Mary J. Doty made a will leaving her entire estate to Mr. and Mrs. Wilbur Clark or the survivor of them or to their issue in case they should predecease the testatrix. On petition of California Trust Company the will was admitted to probate and the petitioner was appointed executor. Merle Armstrong Nielson, James Armstrong, Charles Armstrong and Jane Irene Briggs filed a petition for revocation of probate charging incompetency, fraud, and undue influence of Wilbur Clark and his wife, Sylvia. The cause came on for trial before a jury and at the conclusion of the case for the contestants the court granted a motion for nonsuit and entered judgment of dismissal. The appeal is from the judgment. The points on appeal are that there was sufficient evidence to have sustained a judgment in favor of contestants and that the court was in error in excluding certain evidence which they offered.

The contestants are nieces and nephews of decedent—Jane Briggs being the child of Charles, a deceased brother, and the other three being children of a deceased brother, James. Lucy Montgomery, deceased, mentioned in the testimony, was a sister of decedent. Sylvia (Mrs. Wilbur Clark), Rose Frosch, and Gertrude McCollam are stepdaughters of decedent, being the children of decedent's husband, Frank J. Doty, who died April 9, 1946.

At the time of her death on June 17, 1946, decedent was 81 years of age. She had come to Santa Monica from Iowa in March, 1912, with her sister, Lucy, her brother, Charles Armstrong and his wife, and their daughter who is now Jane Irene Briggs. The four lived together until November, 1912, when decedent married Mr. Doty who had migrated from Iowa with decedent and the others. His daughters, Sylvia and Gertrude, remained in Iowa; Rose lived in Ohio. On March 31, 1946, Sylvia received a telegram advising her that her father had suffered a stroke, was critically ill and requesting her to come to him. When she and her husband, Wilbur Clark, arrived in Santa Monica on April 6th, Rose and Gertrude were already there. Mr. Doty died within a few days and his funeral took place April 12th. The three sisters remained in Santa Monica until the 12th. Wilbur remained until April 26th and Sylvia continued to live in the Doty home. Jane Irene Briggs, whom we will call Jane, had resided in California from the time of her arrival in 1912, had attended business college in 1921 and was employed until shortly before she married in 1927. She separated from her husband in 1933 and in February and March of 1946 was employed as desk clerk in a hotel in Long Beach. On April 5th she received word from Mrs. Sperling, a friend of decedent, that Mr. Doty was ill, visited the Doty home on the following day, found the Iowa and Ohio relatives there and her Uncle Frank in bed. The contestants, other than Jane, are nonresidents and did not come to California.

The charges of fraud and undue influence relate to the interval between April 6th, the date of arrival of the relatives from the middle west, and May 9th when the will was made. Wilbur and Sylvia Clark were accused of undertaking to prejudice decedent against Sylvia's sisters, Gertrude and Rose, and also against the contestants and it was alleged that they made the following representations: (a) that Jane should not receive decedent's property because she was going to marry a rich old man to obtain his money, (b) that Jane was mad at

decedent because the latter would not purchase two certain burial lots from her, (c) that they falsely promised decedent that they would take care of her during the remainder of her lifetime if she would leave them her property, (d) that Gertrude and Rose did not like decedent, (e) that Jane was ill and unable to and would not care for decedent, (f) that the Clarks concealed from decedent that they were remaining with her for the purpose of inducing her to make a will in their favor, and that they remained with her in order to prevent the other relatives from discovering that a will had been made.

There was insufficient evidence to have supported a finding that the testatrix was lacking in testamentary capacity, and the court properly withdrew that issue from the jury. The evidence on this issue established only that decedent's eyesight and hearing were very poor, and that she was suffering from other infirmities of old age; she discussed events of the past and in doing so was repetitious; she slept a good deal and when engaged in conversation would sometimes fall asleep. No witness testified that her memory was not normal for a person of her age, or that her ideas and speech were disconnected or incoherent. From her activities as related by the witnesses it appears that she knew, and was interested in, what was going on around her; she had some business matters to attend to in connection with her husband's estate and also concerning the occupancy of a small house on the premises in which Mrs. Sperling was living, and which decedent wished to repossess in order that Mr. and Mrs. Clark and their children might live there; there was no evidence tending to show that decedent was unable to comprehend the nature of these business matters. Although several witnesses testified that in their opinion she was of unsound mind, they gave no specific reasons for their opinions other than her general appearance, manner and condition. Granting to these opinions the greatest possible weight, it could be said only that they were based upon such facts as have been related, namely, the age of decedent, and her obvious lack of mental and physical vigor, a condition which was affected by the shock of her husband's death. Such opinions added nothing to the other evidence which was relied upon to establish testamentary incapacity. While there was evidence that in the early part of May, when she made Jane a present of a ring, she stated that Jane was ''the last of the Armstrongs,'' this would appear to have been a mere figure of speech intended as a reason for the gift, and

was by no means sufficient to prove that decedent had forgotten the existence of her other nephews and niece who also are contestants. There was testimony that on another occasion she had stated that so far as she was concerned Jane was her only living relative. Decedent was not called upon at the time to state her recollection as to the number of her living relatives or to name them. By her actions, as well as her expressions, it is quite clear that testatrix meant that Jane was the only one of the Armstrong relatives whom she wished to remember by gifts or by will. The mental infirmities of Mrs. Doty were only such as usually manifest themselves in aged persons and in the case of testatrix were not present in an extreme degree. ■ The authorities hold uniformly that loss of mental vigor due to age, even though accompanied by a degree of forgetfulness, does not evidence a want of legal capacity to make a will. The subject is thoroughly discussed with citation of authorities in the *Estate of Selb,* 84 Cal.App. 2d 46 [190 P.2d 277].

■ In support of the specifications of fraud, contestants relied in part upon the testimony of Frankie Jean Hackett, who was Mrs. Doty's hairdresser and beautician. Mrs. Hackett testified that within a few days after Mr. Doty's funeral, she had a discussion with Mrs. Doty in the presence of Sylvia during which Mrs. Doty said she was all alone; that "Sylvia said, 'You are not alone Mother. Wilbur and I are going to take care of you. Let Jane go marry her rich old man.' And I said: 'Is Jane getting married?' and Sylvia said, 'Yes, she does not have time for mother any more.' " Jane testified that on June 5th she brought up the subject with decedent and told her that the report that she was going to marry a rich old man was untrue, that she had no intention of marrying anyone. In reply, decedent said, "you can marry anyone you want to"; she, decedent, did not want any of Aunt Lucy's property; Lucy had been mean to her and that she and Sylvia knew this; she, decedent, was going to give the property to Jane; Rose and Gertrude did not like her; if they loved her they did not show it very much, and she and Sylvia knew that they did not. She also said that Mrs. Sperling had told Sylvia that Jane was angry at her, decedent, because she had not purchased some burial lots from Jane. Jane testified that she assured decedent that this was not true, saying, "Why Aunt Mary you know me better than that. Why that just cannot possibly be," and that she assured decedent that Rose and Gertrude loved her. She also

testified that decedent said in the same conversation that Jane was not well enough to take care of her, and that she, Jane, insisted that she was able to do so. Jane also testified that it was not true that she was or had been engaged to marry an old man.

It must be assumed, as testified to by Mrs. Hackett, that Sylvia did make the assertion concerning Jane's supposed intention to marry, and the further statement that she did not have time for Mrs. Doty any more. These were evidently assumptions upon Sylvia's part, with slight or no foundation in fact. However, it was in evidence that Mrs. Doty, Mrs. Soulé, Jane and Sylvia visited the cemetery, shortly after Mr. Doty's funeral, and that the four traveled in the car of Mr. Hutchins, who was Jane's employer. Mr. Hutchins had operated a defense plant during the war, and later made costume jewelry. Jane, with some 19 other persons, had been employed by him from 1943 until the end of 1946, excepting for a brief period in the early part of 1946. She managed the office, took care of the orders, attended to his banking, purchased supplies, and also drove his automobile. At Mrs. Doty's request Jane had brought Mr. Hutchins to the Doty home, and he was known to them as "Dad." The circumstances were such as to stimulate family gossip and Sylvia's remarks fell in that realm, even though they were made for a purpose. It would be difficult to believe that they were intended as representations of fact, when Jane was at hand to refute them if they were untrue. Nor was there reason to believe that decedent would have relied upon mere chatter as against Jane's positive statement that she had no intention to marry. The only evidence that decedent believed that her nieces, Gertrude and Rose, did not care for her, consisted of a statement she was alleged to have made to Jane to that effect. This, however, was nearly a month after the will was executed, and there was no evidence whatever that either Sylvia or Wilbur Clark had made such a representation to decedent. Nor was there testimony that either of them had represented to decedent that Jane and her mother were unable to take care of her. The additional specification that the Clarks had promised decedent that they would stay with her and care for her without intention to keep the promise was not proved. Wilbur Clark testified that they did make such a promise, but that it was in response to a proposal by decedent that he and his wife remain with her. There was no evidence whatever that they did not intend to do as they

promised. The circumstances we have related were entirely insufficient to support a finding of any fraudulent representations made by the Clarks to decedent. It was also insufficient to support a finding that decedent, in making her will, relied or acted upon any representation made by the Clarks to her, unless it was their promise to stay with her and care for her. It will become clear, in our discussion of the issue of undue influence, that the Clarks were probably made beneficiaries of decedent's will because they had come to Santa Monica and taken care of their stepmother after her husband's death, and she wished and expected them to remain with her.

The facts that we have related were relied upon by contestants as supporting their charge of undue influence. In addition thereto they produced evidence that Mrs. Doty had great affection for Jane and had frequently stated that she intended to leave her property to Jane. It is contended, and we think with good reason, that this evidence was sufficient to support an inference that had Mrs. Doty made her will before the development of the intimate relationship between her and the Clarks, Jane would have been named as the principal if not the sole beneficiary. There was certainly persuasive evidence of a complete change in Mrs. Doty's testamentary plans, and the change has added significance from the fact that a stepdaughter and her husband were made sole beneficiaries and no provision was made for the favorite niece of testatrix.

██ The fact that a testator makes material changes in his plans from those formerly entertained, or fails to make provision for those who are closely related to him, should be taken into consideration in determining whether the will expresses his true desires, but neither of these facts is of importance if it is established by the evidence as a whole that the testator was competent and that the will was not the result of mistake, fraud or undue influence. (*Estate of Langford*, 108 Cal. 608, 624 [41 P. 701]; *Estate of Wilson*, 117 Cal. 262, 277-78 [49 P. 172, 711]; *Estate of Tribbey*, 58 Cal. App.2d 100, 104 [135 P.2d 603].) ██ However, a study of the entire record leads only to the conclusion that Mrs. Doty changed her plans, not because she became less fond of her own kin, or of her stepdaughters Gertrude and Rose, but only because she developed a greater fondness for Sylvia and a feeling of dependence upon her and her husband. There was no evidence that Mr. and Mrs. Clark controlled or dominated

the actions of Mrs. Doty in any manner, or that she looked to them for advice or guidance. They did in fact take charge of the household, but not to the exclusion of Jane and her mother or Sylvia's sisters, Rose and Gertrude. That they were in a position to and might have exercised influence over testatrix was not enough. It was necessary for contestants to show actual exertion of undue influence at the time of the testamentary act. There was no direct evidence sufficient to support a finding of the exercise of undue influence. Neither was there circumstantial evidence sufficient for that purpose. The evidence justifies a suspicion, perhaps even a strong suspicion, that Mr. and Mrs. Clark exerted every effort to ingratiate themselves with Mrs. Doty and to win her favor, but even so, it would not follow that their conduct was wrongful or unfair to Mrs. Doty or to the contestants. They had a right to employ fair means to win her affection, and so far as disclosed by the evidence they accomplished this purpose by their personal care of Mrs. Doty and the promise to remain with her as long as she needed their attention. Proof of such activities, however effective they may be, is not sufficient to establish undue influence. The law does not denounce acts that are praiseworthy, but only those that are to a greater or less extent wrongful. ■ Proof of conduct which merely inspires affection and gratitude, standing alone, does not even tend to prove undue influence. If it results in recognition by a testamentary act it is regarded as a natural and proper result. If the acts themselves are not be be condemned, the fact that they are inspired by a selfish motive does not give them legal significance. As stated by the court in *Estate of McDevitt,* 95 Cal. 17, 32 [30 P. 101], "Good feeling thus won does not invalidate the will, although the services may be rendered to induce testamentary favor." In the same case, in speaking of the sufficiency of proof of the use of undue influence, it was said (p. 33), "Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." This statement has been quoted with approval and followed in many cases. (*Estate of Leahy,* 5 Cal. 2d 301, 304 [54 P.2d 704] ; *Estate of Rickey,* 64 Cal.App. 733, 742 [222 P. 628].)

■ Different rules apply where the beneficiary occupies a confidential relationship toward the testator and is shown

to have been active in the preparation of the will. Such facts give rise to a presumption of the use of undue influence. (*Estate of Graves,* 202 Cal. 258, 262 [259 P. 935] ; *Estate of Harkleroad,* 62 Cal.App.2d 60 [144 P.2d 88] ; *Estate of Witt,* 198 Cal. 407 [245 P. 197].) ■ The evidence clearly established that decedent reposed confidence in Sylvia and her husband. She gave Wilbur $200 just before he returned to Iowa, on April 27th, to help him out on the purchase of a truck for his farm. She gave Sylvia a check for $100 at about the same time, saying that it was Mr. Doty's wish that she give each of the girls this amount. Sylvia did shopping for the household and assumed the care of the premises. Decedent stated on a number of occasions and to different persons that the Clarks were going to stay with her and take care of her. So far as is disclosed by the evidence, no one other than the Clarks was prepared to take care of Mrs. Doty after the death of her husband. Jane was employed in a hotel in Long Beach and her mother resided in Los Angeles where she had been employed in a hotel for a number of years. The other contestants were nonresidents. The Clarks had a 200-acre farm in Iowa and were evidently in a position to remain with Mrs. Doty in Santa Monica. It is quite evident that she had chosen them as her companions from among others who might have served her in that capacity. She was quite anxious to accomplish the removal of Mrs. Sperling as the tenant of a small house on her property, and to install the Clarks therein. Her condition was such as to render her dependent upon others. A finding of a confidential relationship would have been well supported by the evidence.

There was, however, no sufficient evidence of activity on the part of Mr. or Mrs. Clark in the matter of the execution of the will. Mr. Moe Fogel had acted as attorney in the administration of the estate of Mrs. Doty's brother Charles, and that of her sister Lucy. Carvel Torrence officed in the same suite with Mr. Fogel. There was testimony that after Mr. Doty's death Sylvia Clark made inquiry as to who was Mrs. Doty's attorney, but her interest in the matter apparently ended with that inquiry. The circumstances of the preparation of the will were related by Mr. Torrence. On April 17th, he was called to the California Bank by one of its officers, where he met Mrs. Doty. It was suggested by one of the officers of the bank that Mrs. Doty might desire to make a will, but the interview on that occasion was quite brief. If she named her proposed beneficiaries, Mr. Torrence

was unable to recall them. Mr. Torrence saw Mrs. Doty again the next day at the bank in the presence of Mr. Whitcomb, deputy county treasurer. They entered the Doty safe deposit box and with Mrs. Doty's consent Torrence took the contents to his office. He saw her the next time the early part of the following week, but had only a brief discussion with her as he had not checked the contents of the box. He saw her again on April 22d or 23d when Mrs. Clark was with her. The conversation at that time concerned O. P. A. regulations and the house that Mrs. Sperling was occupying. The interview lasted about 15 minutes and no mention was made of a will. On April 26th, Mrs. Doty again came to his office with a neighbor, Mrs. Harris, and a petition for letters of administration upon Mr. Doty's estate was prepared. There was a discussion about the will and Mrs. Doty named the intended beneficiaries, but Mr. Torrence could not recall whether they were the same as those she had mentioned at the time of the first interview. He testified that Mrs. Doty gave him the names and addresses of the other relatives, although this was principally in connection with the proposed proceedings in the estate of Frank Doty. She stated that she wished to leave her property to Wilbur and Sylvia Clark, or the survivor of them if one predeceased her, and to Jane Irene Briggs, if both the Clarks predeceased her, and that Mr. and Mrs. Clark were going to take care of her. It was arranged that Mrs. Doty would return to execute the will and one was prepared according to her instructions. On May 2d, she returned with Mrs. Harris and requested that the issue of Mr. and Mrs. Clark be substituted as contingent beneficiaries in the place of Jane Irene Briggs. This change was made but the will was not executed until May 9th. Mr. Torrence was called to Mrs. Doty's home on that day and took with him Harry Thomas, an office associate. The will was read to Mrs. Doty and explained to her, and she stated that it was just the way she wanted it. The will was then executed, and it was arranged that Mr. Torrence would take the will with him and that Mrs. Doty would call for it at his office and place it in her safe deposit box. Subsequently, she came to the office with Mrs. Clark, but the only matter discussed was the O. P. A. regulations and the house in which Mrs. Sperling was living. She later came to Mr. Torrence's office with Mrs. Harris, and at that time took the will. Mr. Torrence testified that although Mrs. Doty's sight and hearing were poor, he had no difficulty in carrying on a conversation with her.

At the time the will was executed, Anne Soulé, a Mrs. Groner, and Sylvia Clark, were in the house. Sylvia suggested that the three women go into the kitchen, but Mrs. Doty came to them and told them to go into the bedroom, which they did, and closed the door. Only Mr. Torrence and Mr. Thomas remained with Mrs. Doty and they subscribed the will as witnesses. They were present on that occasion for one-half or three-quarters of an hour.

While Wilbur and Sylvia Clark both had ample opportunity to influence Mrs. Doty to make a will in their favor, and it might reasonably be suspected that they did discuss the matter with her, an inference that they did so would have been unjustified. So far as disclosed by the evidence, Mrs. Doty discussed the terms of her will with no one except her attorney, and then only in the presence of bank officers or a neighbor, Mrs. Harris, or Mr. Thomas. There was no evidence that the matter of a will was ever discussed between Mrs. Doty and the Clarks. If there was activity on the part of anyone, or even a discussion of the terms of the will with anyone other than Mr. Torrence, that fact was not brought to light during the trial. In the absence of evidence of activity on the part of the beneficiaries, or either of them, no presumption arose of the exertion of undue influence by them. (*Estate of Hull,* 63 Cal.App.2d 135, 140-42 [146 P.2d 242]; *Estate of Baird,* 176 Cal. 381, 384 [168 P. 561]; *Estate of Garvey,* 38 Cal.App.2d 449, 462 [101 P.2d 551]; *Estate of Lepori,* 4 Cal.App.2d 761 [41 P.2d 970].)

It seems scarcely necessary to add that strong support of the will was furnished by the evidence that Mrs. Doty was free to consult with friends and relatives at all times and that the will was prepared from directions given personally by her to her attorney, in the absence of any interested parties, was executed under like circumstances, and also that she had the will in her possession for more than a month after it was executed. (See *Estate of Fraser,* 75 Cal.App.2d 99, 104 [170 P.2d 704]; *Estate of Shields,* 49 Cal.App.2d 293, 301 [121 P.2d 795]; *Estate of De Soberanes,* 182 Cal. 525, 528 [189 P. 103]; *Estate of Donovan,* 140 Cal. 390, 393 [73 P. 1081]; 26 Cal.Jur. § 78, p. 730.)

Appellants offered to prove that decedent and her sister Lucy inherited more than $60,000 from their father, Dr. Armstrong, who died in 1911, and that he had given decedent $12,000 with which she purchased her home. Objections to the offered evidence were sustained and the rulings

are assigned as error. The theory of appellants is that Mrs. Doty's holdings at the time of her death derived from her inheritance and gifts from her father and that it would have been natural for her to leave her estate to members of the Armstrong family. If it be granted that the evidence would have tended in some degree to prove that the Armstrongs had a better claim to the estate than the Dotys, who were relatives by marriage only, the exclusion of the evidence cannot be regarded as prejudicial. The fact that a will is not as fair and just as it might have been is only a circumstance to be considered with evidence tending to show want of testamentary capacity, undue influence or fraud. If the offered evidence had been admitted the proof of the contestants would not have presented a case for the jury.

The judgment is affirmed.

Wood, J., and Vallée, J., concurred.