[Civ. No. 17897.   Second Dist., Div. Three.   July 26, 1951.]

Estate of DAVID SCHLYEN, Deceased.   SHIRLEY D. SCHLYEN et al., Respondents, v. ALICE HARRIET SCHLYEN, Appellant.

Benjamin Elconin and Max Bergman for Appellant.

Samuel W. Blum and M. Seaton Cohen for Respondents.

WOOD (Parker) J.—Appeal from judgment denying petition for probate of will. David Schlyen died on October 5, 1948. On October 28, 1948, a petition for probate of his alleged will, dated April 20, 1945, was filed by Alice Harriet Schlyen, his surviving spouse. Under the terms of the alleged will[1] all of decedent's property, except $2.00, was given to Alice Harriet Schlyen. One dollar each was given to dece-

---

[1]"'LAST WILL AND TESTAMENT

I, DAVID SCHLYEN, of Los Angeles, California, being of sound and disposing mind and memory, and not acting under restraint or influence, do make and declare this my Last Will and Testament, as follows:

FIRST: I hereby revoke all former Wills made by me.

SECOND: I direct that all my just debts and funeral expenses and expenses of my last illness be paid.

THIRD: I hereby give, devise and bequeath to my wife, Alice Harriet Schlyen, all my property, both real and personal, of any nature and description whatsoever, and wheresoever situated.

FOURTH: To each of my children, Shirley D. Schlyen and Leon S. Schlyen, I bequeath the sum of One and no/100 ($1.00) Dollars.

FIFTH: Should any person contest this Will, or claim any portion of my estate, then, in that event, they shall receive not more than the sum of One and no/100 ($1.00) Dollars, which sum I bequeath to them.

LAST: I hereby nominate and appoint my wife, Alice Harriet Schlyen, the Executrix of this, my Last Will and Testament, to act without bond, and with full power to sell all real and personal property at public or private sale, with or without notice and without bond.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of April, 1945.

David Schlyen
David Schlyen

The foregoing Will, all on two (2) pages, was signed in our presence by DAVID SCHLYEN, who declared it to be his Last Will and Testament,

-1-

and we subscribed the same as witnesses, at his request and in his presence, and in the presence of each other on this 20th day of April, 1945.

| First Witness—Name | Henry H. Rothenberg |
| Address | 4324 Burns Ave. |
| | Hollywood 27, Cal. |
| Second Witness—Name | Claire Rothenberg |
| Address | 4324 Burns Ave." |

-2-

dent's daughter and son by a former marriage. Appellant was named executrix therein to act without bond. The two children (who were then minors) by their mother as guardian *ad litem*, filed written "Opposition to Probate of and Contest to Will," in which they alleged in substance: (1) that said purported will was not properly executed; (2) that at the time said purported will was allegedly executed the decedent was of unsound mind; (3) that the execution of said purported will was procured by the undue influence of Alice Harriet Schlyen; and (4) that the execution of said purported will was procured by fraud exercised upon the decedent by Alice Harriet Schlyen.

The present proceeding (the will contest), by stipulation of the parties, was consolidated for trial with an action between the same parties, wherein the children sought to cancel two deeds, dated May 28, 1948, which purportedly conveyed certain real property to decedent and Alice Harriet Schlyen as joint tenants. The jury was instructed that the court found, as a matter of law, that the will was executed in proper form, in accordance with the laws of the State of California, and that the decedent had testamentary capacity at the time of the execution of the will. The jury was further instructed that the only issue to be decided by it "in connection with the Will," was to determine whether the testator, at the time said will was executed, was acting under "undue influence or fraud" on the part of Alice Harriet Schlyen. Special interrogatories, submitted to the jury in the will contest, were as follows: 1. Was the will dated April 20, 1945, executed by David Schlyen, procured by undue influence on the part of Alice Harriet Schlyen? 2. Was the will dated April 20, 1945, executed by David Schlyen, induced and procured by fraud on the part of Alice Harriet Schlyen? The answer of all members of the jury to each interrogatory was "Yes." Also, special interrogatories, as to whether the joint tenancy deeds were procured by undue influence and fraud, on the part of Alice Harriet Schlyen, were answered in the affirmative by the jury.

Alice Harriet Schlyen thereupon made a motion in each case for judgment notwithstanding the verdict, which motions were denied. Judgment in the present proceeding was entered in accordance with said answers of the jury and the petition for probate of the alleged will of decedent was denied. In the action to cancel the joint tenancy deeds, the trial judge adopted the said answers of the jury (which were advisory),

and the judge found that the deeds were procured by undue influence and fraud on the part of Alice Harriet Schlyen; and that property purportedly conveyed by the deeds was the separate property of decedent. Judgment in that action was entered accordingly, and it was ordered therein that the two joint tenancy deeds be cancelled and an accounting of rents, issues and profits be made. Alice Harriet Schylen thereafter made a motion for a new trial in each case, which motions were denied. She filed a notice of appeal from the judgment in each case. Respondents made a motion to dismiss the purported appeal from the judgment in the action to cancel the joint tenancy deeds, on the ground that the judgment was interlocutory and not final. The motion was granted. As above stated, the matter now before the court is the appeal by Alice Harriet Schlyen (proponent) from the judgment in the will contest denying probate of the alleged will.

Appellant contends that (1) the evidence is insufficient to sustain the "verdict of undue influence"; (2) there is no evidence to sustain the "verdict of fraud"; and (3) there were errors in the instructions to the jury.

In reviewing the question as to the sufficiency of the evidence in a will contest, the province of the reviewing court is the same as it is in any civil case involving sufficiency of the evidence. (*Estate of Trefren,* 86 Cal.App.2d 139, 141 [194 P.2d 574]; *Estate of Pohlmann,* 89 Cal.App.2d 563, 567 [201 P.2d 446].) The evidence must be viewed in the light most favorable to the respondent, and all conflicts must be resolved in favor of respondent. (*Estate of Pohlmann, supra,* 568.) The power of the reviewing court "begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689].) The evidence in the present case therefore is stated in the light most favorable to the respondents.

Decedent was 52 years of age at the time of his death. While he was in the army in World War I he sustained the injuries for which he received temporary partial disability benefits in 1919 and 1920 from the Bureau of War Insurance (Veterans Administration). In 1919 he completed a course in pharmacy. In 1927 decedent and Fannie Herman were married. Respondents herein are the children of that marriage. The respondent Shirley D. Schlyen was born in 1928 and the

respondent Leo S. Schlyen was born in 1930. In 1934 Fannie obtained an interlocutory decree of divorce from decedent on the ground of habitual intemperance. During the marriage Fannie had purchased a drugstore, with money given to her by her mother, and she operated the store as her separate property. Prior to the time the divorce decree was made, they entered into a property settlement agreement which provided that Fannie should pay decedent the sum of $500; that the parties released each other from any further claims; and that Fannie should be solely responsible for the support and maintenance of the children. In consideration of the execution of that agreement, decedent "assigned" all of his property to Fannie, which property was encumbered and some of it was subject to foreclosure proceedings at that time. The total amount realized by Fannie from that property was $200. In the divorce action the custody of the children was awarded to Fannie. In 1935, 10 days after the divorce decree became final, Fannie married John Carelli, and the respondents since that time have resided with their mother and stepfather. Between 1937 and 1939 decedent purchased a drugstore and two parcels of improved real property. In 1938 decedent filed an application for disability benefits, and he was given a physical examination by the Veterans Administration. The diagnosis included findings of moderate neurasthenia and arteriosclerosis, and he was granted a 44 per cent partial disability rating. In 1940 decedent was given another physical examination by the Veterans Administration. At that time he complained of nervousness and headaches. The diagnosis included findings of neurasthenia and hypertension; and the disability rating of 44 per cent was continued.

About 1940, decedent was convicted "on a narcotic charge," and he applied for probation. At his request and in his behalf, Mrs. Carelli went to the probation department. He was granted probation. Thereafter, in June, 1940, the decedent married Lillian Viner. Prior to the marriage decedent and Lillian entered into a prenuptial agreement in which it was recited that decedent was then the owner of two parcels of real property, which property had been purchased by decedent from his separate funds; that one of those parcels, which was on Olympic Boulevard, was "subject to a trust deed in the approximate balance of $7,000.00," and the other parcel, which was on Manchester Boulevard, was "subject to a trust deed in the approximate sum of $12,500.00." It was further recited therein that decedent desired to execute a will by the

terms of which the said two parcels of real property would be devised to the respondents herein; and that said Lillian Viner thereby relinquished any right to that property. Approximately six months after the marriage Lillian obtained an annulment, by default, on the ground that at the time of the marriage decedent was physically incapable of entering into the marriage relationship, and that the incapacity was incurable.

About 1941 decedent became acquainted with Alice Marks, the appellant herein, in her father's jewelry store which was "three doors" from decedent's drugstore. Appellant was then assisting her father in conducting the business of the jewelry store, but she had previously been employed about 17 years as a medical stenographer. In January, 1943, decedent was given another physical examination by the Veterans Administration. At this time he stated that he felt nervous, had to take sedatives in order to sleep, and tired easily. The Rating Board of the Veterans Administration reported an improvement in his "service-connected neurasthenia," but continued the 44 per cent disability. On March 18, 1943, decedent and his brother, Joseph Lyon (formerly Joseph Schlyen), entered into a written agreement which recited that decedent desired to take a vacation "for his health's sake," and that he appointed his brother "as manager in full charge" of the drugstore for one year. On September 3, 1943, the decedent and appellant were married, and they moved to the apartment which was occupied by appellant's parents. At the time of the marriage appellant had about $1,650 cash and approximately $350 in war bonds. Decedent at that time owned the drugstore and the two parcels of encumbered real property hereinbefore referred to. At the time of the marriage Carl Peterson, who was in the business of managing real property, was acting as manager of the said two parcels of real property. He collected the rents and obtained new tenants when vacancies occurred. Each month decedent went to Peterson's office for "a check," and after decedent and appellant were married the appellant went to the office with decedent "most of the time." About January, 1944, decedent went to Peterson's office and made a will, and Mr. and Mrs. Peterson were the subscribing witnesses thereto. In that will decedent gave his separate property to respondents. Peterson testified that the appellant was present, that decedent dictated the will to her, that she "typed" the will on Peterson's typewriter, and they were both very cheerful. He testified fur-

ther that appellant was "very meek and docile" until April, 1944, when she told Peterson that the property was not paying enough rent and she could get more rent for it; she repeated said statement in May; after June, 1944, Peterson did not represent the decedent, and the property was managed by another agent.

Decedent's relationship with the respondents from the time of his divorce from their mother to the time of making the will in 1944 remained friendly. He went to see them frequently. He occasionally took them to places of amusement, gave them money and brought them gifts. In 1942 he gave each of them his photograph. He carried pictures of them in his wallet. The respondents had telephone conversations with decedent, and sent birthday and Father's Day cards to him.

In the spring of 1944, Mrs Carelli told decedent that they did not have "anything in writing about the children" and she asked him if he could get appellant to enter into an agreement like the prenuptial agreement he had made with Lillian Viner. In December, 1944, Mrs. Carelli wrote a letter to decedent in which she stated that decedent had said on various occasions that he was "making provision" for the children but that he had refused to discuss the matter with Mr Frankel (her attorney). She stated further therein that Shirley was "almost ready for college, and Sonny [Leo] ready for senior high school," and it was impossible for her to bear the expense of their education alone, and she felt that he should pay $60 a month toward the education and support of each child. In February, 1945, there was a meeting in Mr. Frankel's office, which was attended by Mr. and Mrs. Carelli, appellant, decedent and Mr. Frankel, at which there was a discussion concerning the support of respondents, and decedent stated that Mrs. Carelli knew that certain property was "going to the children, and that should be enough for now." Mr. and Mrs. Carelli testified that appellant then took a written instrument from her handbag and said, "We have made out a will," and she handed the instrument to Mrs. Carelli who read it; that Mr. Frankel then read the instrument and stated that it was a fine will "if it will stay that way," and appellant replied, "You will have to take our word" that it will stay that way. Mr. Frankel testified at the trial herein that all he remembered was the purpose and the result of the meeting; that he tried to get decedent to support the

respondents and was unsuccessful, but that he did not recall being shown a will. About two months after that meeting decedent was served with an order to show cause (re support of the children) in a proceeding filed by Mrs. Carelli. Hearings were had in the superior court on April 17 and 18, 1945, and decedent was ordered to pay $100 a month for the support of respondents. Thereafter, appellant told Mrs. Lyon, in the presence of decedent, that she (appellant) thought Mrs. Carelli had "a lot of nerve making Dave support the children."

After decedent had been served with the order to show cause, and prior to the hearing thereon, appellant "suggested" to him the name of an attorney, Leo Goodman, by whom appellant had been employed approximately one week about 15 years previously. Also, after said order was served on decedent, he and appellant for the first time "had a discussion about making a will." Appellant, in a telephone conversation with Mr. Goodman, made an appointment for decedent and her to go to Mr. Goodman's office. On the date designated, about April 9, 1945, decedent and appellant went to Mr. Goodman's office. Appellant introduced decedent to Mr. Goodman and remained in the office with them. During the meeting the order to show cause and the matter of a will were discussed. Decedent showed Mr. Goodman a will which Mr. Goodman read. Mr. Goodman dictated a "disinheritance clause" to appellant, and she wrote the dictation in shorthand. Then she and decedent returned to their home. Mr. Goodman did not charge them a fee but performed said service "as a favor." On cross-examination Mr. Goodman testified that prior to the trial herein he had told counsel for respondents that it was his best recollection that he had dictated the "disinheritance" clause, at the request of appellant, during a telephone conversation with her; that he later discussed the case with appellant and with her counsel, and in thinking it over he came to the conclusion from his own recollection that the facts were different from those which he had related to respondents' counsel; that prior to the trial he informed respondents' counsel that he (the witness) was wrong and he had not dictated the disinheritance clause over the telephone. A few days after the meeting in Mr. Goodman's office, appellant typed the purported will (which is involved herein) in her home and made a carbon copy of it. Appellant testified that she was the sole beneficiary under the 1944 will; that she typed the 1945 will (involved

herein) according to instructions given to her by Mr. Goodman —by copying all the 1944 will, and then adding thereto the matter dictated to her by Mr. Goodman; that said dictated matter consisted of the fourth clause (the bequest of the sum of $1.00 to each of the respondents) and, she believed, the fifth clause (the bequest of no more than the sum of $1.00 to any person who should contest the will). The day after appellant typed the will she called Mr. Goodman on the telephone and read the instrument to him and asked him "if he thought it was all right." On the evening of April 20, 1945, decedent executed the instrument at his residence, the apartment of appellant's parents. Present at said time were appellant, her parents, her sister and brother-in-law, and the subscribing witnesses Mr. and Mrs. Rothenberg who were friends of decedent and appellant. Prior to the execution of the instrument and before the subscribing witnesses arrived, decedent read the will to the family group. The witnesses arrived about 8 p. m., and the original instrument and the copy of said instrument were then signed. Decedent put the original instrument in his pocket and gave the executed copy of said instrument to his brother-in-law to put in the safe deposit box of the brother-in-law.

In February, 1947, decedent and appellant went to the office of a physician where decedent had a private consultation with the physician and was given a physical examination. At that time decedent complained principally of pain in the calves of his legs. His condition was diagnosed, as disclosed by the case record prepared by the physician, as thromboangiitis obliterans (Buerger's Disease). It was stated in said medical record that decedent had been a "continuous heavy drinker" from 1920 to 1944 but that he had not used alcohol since 1944. On August 11, 1947, decedent was given another physical examination by the Veterans Administration. At that time decedent complained that he was very nervous and jittery, had cramps in his legs, could work about four hours a day, had headaches, did not sleep well, and had to take seconal capsules every night. His condition was diagnosed as neurasthenia, Buerger's Disease, and hypertension.

In 1947 the decedent employed architects who prepared plans for a new house for him and appellant. The construction of the house was begun about September, 1947, and it was completed in May, 1948. The house and lot cost $28,000 and the furnishings cost approximately $8,500. In January,

1948, decedent's brother became ill and was no longer able to work in the drugstore. The drugstore was open for business 12 hours a day, and from 1943 to 1948 the brother had been in charge of the store about eight hours a day and the decedent had been in charge of it about four hours a day. In February, 1948, decedent sold the drugstore.

About March, 1948, decedent was served with a second order to show cause, relative to an increase in the allowance for the support of the respondents, and a hearing was had on April 30, 1948. Decedent, represented by counsel, appeared and opposed an increase in the allowance for support of respondents. The hearing was also attended by appellant, the respondents and Mr. and Mrs. Carelli. This was the first time appellant had seen respondents, and Mrs. Carelli introduced them to her. Decedent and Mr. and Mrs. Carelli testified at the hearing. The court ordered decedent to pay $160 a month for the support of the respondents, and to pay all reasonable medical and dental bills of the respondents—the decedent, however, to be consulted before such bills were contracted.

About April, 1948, decedent deposited the sum of $10,000 in a checking account in appellant's name. On May 28, 1948, decedent executed two grant deeds by which he conveyed to himself and appellant as joint tenants four parcels of real property. Those deeds were recorded on June 8, 1948.

On May 3, 1948, Mrs. Carelli wrote a letter to decedent in which she enclosed a doctor's bill for $25 for medical treatment received by Shirley during the month of April, and she explained that continued treatment would be required. With the letter she sent a pamphlet ''on Buerger's disease'' and a photograph of each respondent. The package (which included the letter) was addressed to decedent, but appellant received it and opened it. She then told Sophie Lyon, decedent's sister-in-law, that she did not want decedent to see the photographs and she wanted to return them. She did not return them, however, after Mrs. Lyon advised her not to return them. During the first part of August, 1948, after the decedent had received a doctor's bill for $55 for medical treatment received by Shirley during July, appellant made a telephone call to the doctor's office and asked an employee in the doctor's office why the amount charged for the treatments was higher than it was the previous month; she (appellant) stated that the physician was a fine doctor but ''they had not'' selected him as Shirley's doctor, and she did not think they

should pay more than they had paid before. The employee with whom appellant had that conversation testified that thereafter appellant called several times, and about August 18, 1948, appellant called and stated she did not feel they should pay more than $25. On August 20, 1948, decedent wrote a letter to the physician in which he stated that he was enclosing a check for $55 for the treatments received by Shirley during July, but that in the future he would be responsible for the payment of only $25 a month unless otherwise authorized by him. He mailed a copy of that letter to Mrs. Carelli, and on the bottom of said copy he wrote a letter to Mrs. Carelli, stating that respondents were receiving $180 a year from the Veterans Administration and that he was "making the suggestion" that Mrs. Carelli "make the additional payments for Shirley" out of that amount. He stated further that he could "discontinue these payments [from the Veterans Administration], by submitting a certified copy of the court order."

On August 21, 1948, Mrs. Carelli wrote a letter to decedent in reply to said letter. Among other things, she stated therein that the court order "does not permit you to set the amount of the bills you will pay or limit the doctor *to* his charges"; that "we raised these children for eleven years, when you contributed nothing," and she then listed specific illnesses suffered by the children which had caused "heavy expense and extreme worry" and "you never once inquired if we could afford the treatments, or even as to the progress of the children"; that if he (decedent) thought he could manage any better than she did, she would be "agreeable to letting you take the children and pay their bills"—that he had a beautiful home "and a fine wife in whose care I would not be afraid to leave" them; that, referring to the veteran's payments, the investigator had never asked her if the children were being supported by decedent; that decedent, as he had always done, would do as he chose in the matter; that decedent had tried to stop the payments before, "even going so far as to deny the paternity of the children to the veteran's investigator"; that decedent's income was "well over $2500 per month," but she was sure if his income were ten times that amount he would still plead poverty; that she was trying to avoid trouble and unnecessary attorney's fees or she would not even bother to answer him. She stated further therein that he had never done anything for the children that he was not forced by law to do; that he had made promise after promise to make a reasonable provision in his will for the

children out of his estate; that when she asked him to make an irrevocable trust "guaranteeing that promise, and foregoing the support of the children you refused to do that." On September 23, 1948, Mrs. Carelli wrote another letter to decedent in which she stated that Shirley was back in school and would be able to take her medical treatments at the school at a saving of approximately $40 a month.

On October 5, 1948, decedent died suddenly from coronary occlusion while driving his automobile. Appellant did not notify respondents of their father's death.

Appellant contends, as above stated, that the evidence was insufficient to support the finding of the jury that the will was procured by undue influence on the part of appellant. The legal principles to be used in determining whether a will is the product of undue influence are stated in *Estate of Trefren*, 86 Cal.App.2d 139, 146, 147 [194 P.2d 574]. ■ Where one, who sustains a confidential relationship to the testator, actively participates in procuring the execution of the will and unduly profits by the will, the burden is upon him to show that the will was not induced by his undue influence. (*Estate of Trefren, supra*, p. 147.) ■ A confidential relationship exists between a husband and wife who are living together. (*Estate of Teel*, 25 Cal.2d 520, 527, 528 [154 P.2d 384].) A confidential relationship existed, in the present case, between decedent and appellant. ■ Under the terms of the alleged will, all the property of decedent was given to appellant, except the sum of $2.00 which was given to decedent's children. Under the circumstances here, the appellant unduly profited by the will. (See *Estate of Bucher*, 56 Cal.App.2d 135, 139 [132 P.2d 257].) ■ Also, in the present case, there was substantial evidence that appellant actively participated in procuring the execution of the will. About 10 days before the will was executed she talked to an attorney, whom she had known several years, and made an appointment for decedent and her to go to the attorney's office. They went to his office and she introduced decedent to the attorney. She was present while the attorney and decedent discussed a will. The attorney dictated a "disinheritance clause" to her and she wrote the dictation in shorthand. A few days thereafter she typed the purported will (involved herein) at her home. The next day she telephoned to the attorney, read the purported will to him and asked him if it was all right. She was present when the will was executed. ■ Under such circumstances, where the appellant occupied

a confidential relationship toward the testator and she unduly profited by the purported will and was active in procuring its execution, a presumption of undue influence on the part of appellant arose. ■ The burden of proof was upon appellant to overcome the presumption. (*Estate of Trefren*, 86 Cal.App.2d 139, 147 [194 P.2d 574].) ■ It was a question of fact for the determination of the jury as to whether appellant had overcome the presumption. ■ The jury could have inferred that appellant was unfriendly with the children. The evidence was sufficient to support the finding that the will was procured by undue influence on the part of appellant.

■ Appellant contends that the court erred prejudicially in instructing the jury as follows: "You are instructed that . . . if you find from the evidence that Alice Schlyen and David Schlyen were man and wife and that David Schlyen imposed great confidence in Alice Harriet Schlyen, and that she was active in the procuring of the Will dated April 20, 1945, whereby she unduly profited thereby, then I charge you that there is a presumption that undue influence was exercised by Alice Harriet Schlyen upon David Schlyen in the execution of said Will and unless that presumption is overcome by convincing evidence on the part of Alice Harriet Schlyen, then you must find that the Will dated April 20, 1945, was procured by the undue influence of Alice Harriet Schlyen, and is invalid." Appellant's argument in support of that contention is that the court directed the jury to find undue influence unless the proponent overcame the presumption "by convincing evidence," that a party who has the burden of proof in a civil issue is not required to carry such burden to the extent of producing "convincing evidence," that all that such party is required "to do is produce a preponderance or greater weight of the evidence, without the necessity of 'convincing' the court or jury of the facts at issue." The proponent was only required to rebut the presumption. ■ In rebutting the presumption she was not required to produce a preponderance or greater weight of the evidence. (*Estate of Eakle*, 33 Cal.App.2d 379, 387 [91 P.2d 954].) ■ Immediately following the above-mentioned instruction the court instructed the jury "that as a matter of law Alice Harriet Schlyen has unduly profited by such will, in the manner as the term 'unduly profited' is used in these instructions." Immediately thereafter the court

instructed the jury "that a confidential relationship existed between David Schlyen and Alice Harriet Schlyen while they resided together as husband and wife." Immediately thereafter the court gave the following instruction: "[I]f you find that Alice Harriet Schlyen, while such a confidential relationship existed between her and David Schlyen, actively participated in procuring the execution of the will dated April 20, 1945, and unduly profited by such will, as defined in these instructions, the burden then shifts to Alice Harriet Schlyen to prove that the will was not induced by her undue influence. This is but another way of saying that upon the concurrence of the elements just mentioned, a presumption of undue influence on the part of Alice Harriet Schlyen has arisen, which must be overcome by Alice Harriet Schlyen." The word "convincing" should not have been used in the instruction first referred to, but it was not prejudicial. "Convincing" means satisfying by proof. (Webster's New Internat. Dict., 1942.)

Proof, however, that is sufficient to overcome or rebut such a presumption does not necessarily consist of evidence whereby it is demonstrated that the presumption has been overcome or rebutted, but such proof might consist of a preponderance of probabilities. In view of the last instruction above mentioned, wherein it was stated in effect that "another way of saying" what was recited in preceding instructions was that the presumption must be "overcome" by proponent, the use of the word "convincing" in the first instruction was not prejudicial.

Appellant also contends that the court erred in giving other instructions. Her argument is to the effect that several of the instructions regarding undue influence and fraud set forth correct abstract principles of law but the instructions had no application to the evidence, were conflicting, confusing, and could have misled the jury. The jury was instructed adequately.

By reason of the above conclusions, it is not necessary to discuss the other contention of appellant that the evidence was insufficient to support the finding of the jury that the will was procured by fraud on the part of appellant.

The notice of appeal herein also states that the appeal is from the verdict, special verdict, and the order denying the motion for judgment notwithstanding the verdict. A verdict and a special verdict are not appealable. Also, the order denying the said motion is not appealable. (*Estate of Frank*, 102 Cal.App.2d 126, 131 [226 P.2d 767].)

The judgment is affirmed. The purported appeals from the verdict, special verdict, and order denying the motion for judgment notwithstanding the verdict, are dismissed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied August 14, 1951. Shinn, P. J., voted for a rehearing. Appellant's petition for a hearing by the Supreme Court was denied September 20, 1951.