[Civ. No. 7982. Third Dist. Nov. 5, 1951.]

Estate of JEANETTE WELLAUER, Deceased. GREGORY J. ALTENHOFEN et al., Appellants, v. D. R. ROBINSON, as Executor, etc., et al., Respondents.

F. H. Bowers and Thomas F. Sargent for Appellants.

Leland J. Propp and Fontaine Johnson for Respondents.

VAN DYKE, J.—Jeanette Wellauer, also known as Jeanette Wellauer Kelly, died August 3, 1949, a resident of Placer County. She left a purported will dated May 2, 1947, which was offered for probate. Gregory J. Altenhofen and Eugene Altenhofen, brothers of decedent, contested the probate of the will on the grounds of mental incapacity, and undue influence alleged to have been exerted by Roland J. Kelly. The case was tried to a jury which returned verdicts in favor of contestants upon both grounds. Motions for judgments notwithstanding the verdicts were granted by the trial court and the will admitted to probate. The contestants appeal.

Decedent's husband, Henry C. Wellauer, died in 1945 in Wisconsin. Decedent became acquainted with respondent

Kelly and they came to California in January, 1946. Kelly returned to Wisconsin for a short time and then rejoined decedent, whereupon they moved to a ranch in Placer County where they resided until decedent's death. They were never married, but lived together as husband and wife and held themselves out to friends and neighbors as being married. By the will she gave to respondent Kelly, whom she referred to as her husband, all her property save gifts to a sister, a niece, a son of Kelly, and two nephews. She made no bequests to either of contestants. Roughly, three-fourths of her estate of around $100,000 in value, most of which she derived from her predeceased husband, went to Kelly.

Three witnesses testified for appellants and their testimony can be summarized as follows: Doctor Barnes, physician and surgeon, had treated decedent at various times from June, 1946, to June, 1948, including treatments on April 8th and in June of 1947, approximately a month before and a month after the will was made. He said that she had degenerated mentally and physically during this period of time, was a chronic alcoholic and had regressed to the mental condition of childhood and was mentally incompetent. On April 8, 1947, he found her suffering from hysterical paralysis of the left side induced by alcoholism. He said she was not of sound mind on that date but was petulant and childish. As to the month of June, he said she was very sick mentally and physically, and mentally incompetent, and he described her as being in the same condition in April; that her conversation during that period could be compared to that of an old person in dotage, that is, the childishness of old age or senility; he could not say what age of child he referred to, but she was childish; she did not have sufficient mentality to use the ordinary judgment of an adult person, could rarely go through with a good conversation, but would go off on tangents and could not be pinned down, and this was true when she was intoxicated and when she wasn't intoxicated; that she could not at any time carry on a completed conversation; that while a child can carry on a conversation it sometimes just prattles. When asked if he knew of times when she was not drinking he said he couldn't say because he didn't know. As an illustration of childish action he said she would promise him to keep off the liquor and as soon as his back was turned she was right back on it, which was about the control a child would have, although the general attitude of a chronic alcoholic. She evidenced lack of full possession of her faculties because she

was unreasonable. She changed from a woman who had been almost immaculate in her person to slovenliness. Appellant Gregory Altenhofen stated that his sister had graduated from Marquette University as an honor student; that she had taught school and been a social service worker at times; that after coming to California she became indecisive and incoherent in her manner of expressing herself; that she had refused to go back to her father's funeral; that he had seen her looking dirty and unkempt when he saw her in a bar and she appeared ''a little bit woozy''; she rambled in her talk; she had lost a lot of weight. He saw her seldom. Gregory's wife, Mary Altenhofen, first saw deceased in January, 1946, when she visited at the witness' home. At that occasion she came out of the car with two bottles of whisky on one arm and a large ''panda bear'' on the other, with which she constantly played; she went to sleep with it on the davenport; she would turn on the radio at any time of day or night; when her brother came in she would try to get her bearings; she would reach into the cupboard and take the condiment containers which she would arrange in a straight line down the table like a little child. She was there two and a half weeks without taking a bath or changing her clothes, which was not her normal mode of living; she had been athletic and cleanly. In April of 1947, while drunk, she was rambling and incoherent and expressed her sorrow that when her husband was buried she had had to have his legs cut off to get him in the casket; during that same month she invited the witness to a New Year's dinner; she would get terribly drunk, was thin and haggard and wouldn't eat; in April of 1947 she was insane; when the witness saw her in June of 1947 she was drunk and could not hold a normal conversation; in December of 1948, one and a half years after she made her will, she was drunk in a bar in Auburn and was found by the witness in a dirty dark room on a dirty bed dressed in dirty old slacks with a rag around her head, wearing an old sweater and so drunk she couldn't be waked up. The witness never saw her when she was sober from the time she came to California until the date of her death; her signature on the will did not look normal. The witness gave it as her opinion that the decedent had not been of sound mind on any occasion she saw her from January, 1946, to May 7, 1947; she could not remember her mother and how she died, or the aunts, uncles, nephews or nieces; she believed she was married to Kelly and said she had been married in the Catholic church in Auburn. When talking to her

attorney when the will was drawn she told him that Kelly was her husband.

A judgment notwithstanding the verdict can be granted only when, disregarding conflicting evidence and giving appellant's evidence all the value to which it is legally entitled, including every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support the verdict. This is the rule whether the issue is presented in a will contest or in any other civil proceeding. The facts relied upon by appellants to support the verdicts of the jury in this case are quite similar to those relied upon for the same purpose in the *Estate of Arnold*, 16 Cal.2d 573 [107 P.2d 25], *Estate of Shields*, 49 Cal.App.2d 293 [121 P.2d 795], and in *Estate of Garvey*, 38 Cal.App.2d 449 [101 P.2d 551], in all of which cases, as in this case, the mental deficiency was claimed to be due to alcoholism. The facts in this case fall far short of those delineated in the cases cited. It is unnecessary to restate the evidence which in those cases was held insufficient to support verdicts of mental unsoundness. To do so would unduly extend this opinion. But a reading of the statements of fact will disclose that they were much stronger than the facts presented and relied on here. On the authority of those cases, which have not been challenged since rendition, we hold that the facts here relied upon are insufficient to support the jury's finding that the decedent, Jeanette Wellauer, was, when she made her will, incapable of doing so by reason of mental incapacity.

Upon the issue of undue influence little need be said. The rules by which the sufficiency of the facts relied upon are to be tested have often been stated. Conceding, for the purpose of argument, that a confidential relation was proved to have existed between Mrs. Wellauer and respondent Kelly, the burden was not thereby cast upon him to prove the will was not obtained through his undue influence in the absence of evidence that he suggested the terms of the will or was active in procuring it. (*Estate of Purcell*, 164 Cal. 300, 303 [128 P. 932]; *Estate of Baird*, 176 Cal. 381, 384 [168 P. 561].) In *Estate of Arnold, supra*, the court said, at page 581: " 'As suggested in *The Estate of Higgins*, 156 Cal. [257] 261 [104 P. [6] 8], a "presumption of undue influence" arises from proof of the existence of a confidential relation between the testator and such beneficiary, *"coupled with activity on the part of the latter in the preparation of the will." ' "* As to the evidence and the inferences therefrom which in this

case appellants claim furnish support for the jury's verdict upon this issue, they put the matter as follows: They refer to the evidence we have heretofore set out upon the issue of incompetency and they then refer to testimony of Mrs. Altenhofen that in August of 1946 respondent Kelly was trying to influence deceased in matters relative to her property. They infer this from the witness' statement that about 1:30 or 2 o'clock on a morning in that month she found deceased trying to write some letters and deceased stated the only time she could do this was at that time of night when respondent was asleep because, as she put it, "I understand my own business, I know what I want to do with my own business, and I cannot do it his way." In March of 1946 Mrs. Altenhofen said that respondent Kelly had phoned her and threatened her because she had been holding some checks belonging to decedent and from this they infer that Kelly was of a dangerous disposition. They point to testimony that Kelly stated that during August of 1946 he had struck deceased, "laid her out" and "poured her into bed." She said Kelly ·told her that on that occasion the decedent was unconscious for hours. The same witness testified that in the latter days of April, 1947, she was sitting around with decedent who was drunk, and during that time decedent told her that "Kelly had knocked her out in the bathroom" and that she "was afraid of Kelly." Again, concerning an occurrence in August of 1946, the same witness said that decedent had come to her home, called her a liar, called her husband everything she could lay her tongue to and that Mr. Kelly at that same time said that "he would get Mr. Altenhofen" and decedent backed him up on it. During their life together she paid Kelly's expenses in getting a divorce from his wife in Milwaukee which included paying something over $3,000 as heart balm to Mrs. Kelly who had threatened suit for alienation of affections or had filed one—the witness was not sure. Kelly, in answer to a question if it wasn't true decedent had maintained him all the time they were in California, answered "to a certain extent after we got out here, we were trying to put the ranch on a paying basis. I built the ranch. I did practically all of the work. I had no money when I came out here nor any after outside of what I got from Jeanette." He further said that all the money he got was used for building up the estate. Applying the stated rule to the foregoing testimony, there is a complete failure to sustain the verdict of the jury as to undue influence. There is no evidence what-

ever of any activity on the part of Kelly in the matter of the will. This would be enough, but it may be said that the record shows Kelly did not even accompany Mrs. Wellauer to her attorney's office when the will was made. Upon this issue appellants signally failed to sustain the burden of proof which the law casts upon them.

The judgment appealed from is affirmed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied November 30, 1951, and appellants' petition for a hearing by the Supreme Court was denied January 3, 1952. Carter, J., and Schauer, J., voted for a hearing.