[Civ. No. 20131. Second Dist., Div. Three. Nov. 12, 1954.]

Estate of ARTHUR WILLIAM WHITE, Deceased. ALICE WHITE, Appellant, v. WILBUR L. WHITE et al., Respondents.

Potter, Potter & Rouse and Bernard Potter, Sr., for Appellant.

Don Lake, W. R. Hervey, Jr., and Edward Hervey for Respondents.

VALLÉE, J.—This is a contest of a will after probate. The contestant, Alice White, is the widow of the deceased. The contestees are the three children of the deceased by a former marriage and the executor of the will. The grounds of contest are unsoundness of mind, undue influence exerted by the three children, and want of due execution. The proceeding was tried by the court sitting without a jury. The

judgment denied revocation of probate of the will. The contestant appeals.

The will devised and bequeathed the estate, consisting of separate and community property, as follows: 1. Five hundred dollars to William Rhodes Hervey for the benefit of a Masonic lodge. 2. Half of the community property to contestant, "that being the part in which I understand that she has a present equal and existing interest." 3. The residue, in equal shares, to the three children. The will declares that it was the intention of the testator to dispose of all his property, including his wife's share thereof. It directed that he be buried next to his former wife. It will be noted that the will does not make any provision for Alice.

The court found the deceased was of sound and disposing mind at the time he executed the will, there was no undue influence, and the will was executed as required by law.

Contestant-appellant's assignments of error are that the findings of soundness of mind and want of undue influence are not supported by the evidence and are contrary thereto.

The will was executed on April 17, 1952. At the time, the deceased was 81 years of age, his wife, 79. They had been married 25 years. There were no children the issue of the marriage. Deceased was penurious, hated to spend money, gave his wife no money for necessaries, would not secure medical supplies or employ a physician for her. In January 1950 she separated from him and filed suit for support. He filed an answer alleging cruelty on her part. In October 1950, on his importuning, she dismissed the action and returned to their home.

About 3 years before his death the deceased became ill. He was operated on for cancer in April 1951. From that time on he was unable to care for himself, became extremely ill, emaciated, and moved with difficulty and great effort. He went about the neighborhood dirty, disheveled, unkempt, and improperly dressed. He was extremely irritable, critical, querulous, and of violent temper. He talked incessantly, grumbled to himself, constantly repeated himself, failed to answer questions, jumped from one subject to another without having completed the preceding subject, was incoherent in his speech, and said someone was trying to rob him. He placed padlocks on all of the closets, cupboards, drawers, a floor lamp, and on the toilet paper—usually several locks on one receptacle. He stood naked before the living room window a number of times where he could be seen from the street, and

at other times he stood there urinating into a can. He sat in his bedroom for hours at a time watching customers entering a neighboring liquor store and café and watching the cash registers in them, stating he would shoot anyone who attempted to rob the registers. During the last three weeks of his life he was bedridden and helpless.

Sometime in 1951 Alice had "a severe stroke." She is suffering from arteriosclerosis and was unable to attend the trial or to have her deposition taken. Since the stroke she has been unable to perform her household duties or to care for herself. Mrs. Lafferty, a sister of contestant, performed the household duties and cared for the deceased and Alice for a considerable period of time prior to his death.

Wilbur White aged 55 years, John White aged 50 years, and Stella Emerson aged 59 years, are the children of the deceased. A few weeks before the death of the deceased Mrs. Lafferty informed Wilbur and John that their father's condition was serious. About six weeks prior to his father's death, Wilbur took charge of his father's business affairs. Wilbur testified his father said, "Son, I am unable to handle my affairs and will you handle them for me"; his father gave him an oral power of attorney; he considered he was acting as a trustee for his father. Thereafter he wrote all checks and paid all bills for his father. Wilbur testified that during this time his father handed him the passbook on a $5,000 building and loan certificate and said, "This money is money acquired from the sale of 757 East 21st Street property and I want you children to have it." Wilbur obtained a form for payment of the certificate, secured his father's signature thereto, cashed it, and divided the money with John and Stella. He also cashed $400 of government bonds which were payable to the deceased and on his death to Wilbur, and retained the proceeds.

Wilbur testified he saw his father only occasionally prior to three months before his death; when Mrs. Lafferty notified him of his father's condition he did not go to see him immediately because of foggy weather conditions in the Catalina channel; he advised John of Mrs. Lafferty's call; about six weeks before his father died, he (deceased) was weak but able to move about; a few days before the execution of the will, his father told him he desired to make a will; that he had made ample provision for his wife; on the day preceding the execution of the will he (Wilbur) dictated a memorandum

will to Mrs. Lafferty who wrote it in longhand;[1] the memorandum was placed in a drawer in his father's bedroom and he instructed Mrs. Lafferty to call the bank as requested by his father. Wilbur also testified that the last time he talked to his father was a week before he died, at which time he drove him from Hermosa Beach to a sanitarium in Los Angeles; that he saw him the day before the will was executed; on these occasions his father was able to get up and go to the bathroom; his conversation was coherent and intelligible, and in his opinion his father was rational and of sound mind.

John testified he was apprised of his father's serious physical condition some three weeks before his death; he did not thereafter go to see or visit him; he last saw and talked to his father two or three months before his death; he observed he was a very sick man but saw no change in his mental condition; "that in his opinion as to his father's unsoundness of mind, he doubted that; that he believed his father was of sound mind at that time." Stella Emerson did not testify.

C. L. Roberts testified: he had met the deceased several times in 1936 in connection with Masonic lodge matters; he had not seen or talked with him since that time until the day of the execution of the will; he was requested to go to the home of the deceased and pick up a memorandum of will;[2] he went to the home of the deceased, secured the memorandum out of a drawer in the bedroom of deceased, and stated to Mrs. Lafferty he was a mere messenger for the bank; he took the will (memorandum) to the office of the Herveys in the Rowan Building, Los Angeles, handed it to Wm. Rhodes Hervey, Jr., and informed him that the deceased was in a very serious condition and it was imperative that this will be prepared and presented to the deceased at once; the will so prepared was approximately the same as that of the memorandum; he and Mr. Wm. Rhodes Hervey, Jr., went to the home of the deceased in Hermosa Beach and went into the bedroom of the deceased, who was in bed; Mr. Hervey read the will to the deceased, asked him certain questions and he (Roberts) made notes of the questions and answers; the

---

[1] The evidence does not disclose, except possibly by inference, from whom Wilbur obtained the data for the memorandum.

[2] Counsel for the executor Security-First National Bank says Mr. Roberts was an assistant trust officer of the bank.

The record does not disclose who requested Mr. Roberts to go to the home of deceased and pick up the memorandum of the will or how anyone connected with the bank received the information.

deceased was lying prone (face downward) on the bed during that time; Mrs. Lafferty came into the room at the request of Mr. Hervey; she said at that time she did not think the deceased was in any condition to make a will, and Mr. Hervey said that technically, or legally, he was able to do so; Mrs. Lafferty and one of the others lifted the deceased into a sitting position, placed pillows behind his back and a pillow or books in front of him and he then signed the will; Alice White was not present; he thought she was lying down in another room; in his opinion deceased was of sound and disposing mind.

Wm. Rhodes Hervey, Jr., testified: he had met the deceased one time several years before his death and on the day the will was executed; C. L. Roberts came to his office on the morning of the day the will was executed and informed him (Hervey) that he had on that day picked up a memorandum of a will at the home of the deceased, and handed same to him; Roberts informed him the deceased was in a very serious condition and it was imperative the will be drawn and its execution be secured at once; he then dictated a will in conformity with the memorandum presented to him; he and Roberts then went to the home of the deceased in Hermosa Beach; he was introduced to Mrs. Lafferty who conducted him and Roberts to the room where the deceased was lying in bed; he talked with the deceased and asked him questions and the deceased said he had three children of whom he was very proud, they were all successful; the deceased did not mention his wife, Alice White; Roberts, at Hervey's suggestion, took notes of the questions propounded to the deceased and his answers; the deceased stated he had sold a house for $6,000 prior to his marriage to Alice, he had $3,000 in the bank, $300 worth of tools, and $2,000 in stocks; Mrs. Lafferty was called or came into the room; the deceased who was lying prone on the bed was then propped up, pillows placed behind his back and something placed on on his lap; deceased signed the will and also initialed the interlineations in the will which were initialed by Mrs. Lafferty, Roberts, and Hervey; all three witnessed the will; Mrs. Lafferty said to him she did not think the deceased was in any condition to make a will, and he (Hervey) said that he was legally able to do so, or words to that effect; in his opinion the deceased was of sound mind.

Mrs. Lafferty testified that the next morning after Wilbur dictated the memorandum of the will to her, Roberts

took the memorandum of will and said he was instructed to take it to the firm of Hervey and Hervey, attorneys; on the same day Roberts and Hervey came to the apartment of the deceased, went into his bedroom and there had some conversation with the deceased, which she did not hear; she was later called into the room; the deceased was lying prone on the bed; she stated that she did not think he was in any condition to make a will; Hervey stated he was legally able to, or words to that effect; she and one other person there lifted deceased into a sitting position, placed a pillow behind his back and a book or magazine on his lap; she was not present when he signed the will; the memorandum dictated by Wilbur White was the same in substance as the will offered for probate; Alice White was at all times kind to and considerate of the deceased and was a dutiful wife; in her opinion the deceased was mentally incompetent, irrational, and of unsound mind.

Several intimate acquaintances of the deceased testified he was irrational and not of sound mind at the time the will was made.

Shortly after his father's death Wilbur took from the premises of his father and Alice a pistol, a shotgun, an antique chair, a trunk containing papers and documents, keys, locks, an electric drill, tools, silverware, and various odds and ends. He did not have the permission of the executor to take them. None of these items was inventoried. Wilbur testified Alice made him a present of them and that he had reason to believe there were more bonds but he did not know where they were.

Three or four years prior to the death of the deceased, John had executed a note payable to his father for $1,000 on which $100 had been paid. Wilbur had executed a note to his father for $650. Wilbur testified his sister Stella told him his father had placed the two notes in an envelope which was sealed and had directed her to open it on his death in the presence of the other children; the notes were placed in the envelope during the pendency of the divorce proceedings. On the day immediately following the death of the deceased, Wilbur, John, and Stella met at Stella's home, opened the envelope, and destroyed the notes. Wilbur testified there was a memorandum attached to the notes which said, "In case of my death please destroy." The memorandum was also destroyed.

In a contest of a will on the ground of unsoundness of mind it is presumed that the testator was sane and com-

petent to make the instrument, and the burden rests on the contestant to prove affirmatively, and by a preponderance of the evidence, that the testator was of unsound mind at the time of the execution of the will.[3] " 'The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defects of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust.' (*Jackson* v. *Jackson,* 39 N.Y. 153, 157.) "[4] A testator is of sound and disposing mind and memory if at the time of making his will he has sufficient mental capacity to be able to understand the nature of the act he is doing, to understand and recollect the nature and situation of his property, and to remember and understand his relations to the natural objects of his bounty and whose interests are affected by the instrument.[5] Unsoundness of mind which will invalidate a will must be insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion.[6] The physical condition of the testator and his eccentricities alone do not, as a matter of law, compel a conclusion of unsoundness of mind.[7] The infirmities of age and lapse of memory are not sufficient in themselves to establish lack of testamentary capacity.[8] The claimed infirmities of mind and body must be shown to have had a direct bearing on the testamentary act.[9] In *Estate of McGuirk,* 50 Cal.App. 352 [195 P. 279], it is said (p. 355): "That the testator was unmindful of the presence of ladies when engaged in his duties to nature, used intemperate and profane language on all occasions, was eccentric and said and did things inconsistent with what might be deemed conventional rules, may be readily conceded.

[3]*Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45].

[4]*In re Spencer,* 96 Cal. 448, 452 [31 P. 453].

[5]*Estate of Lingenfelter,* 38 Cal.2d 571, 582 [241 P.2d 990]; *Estate of Whitworth,* 110 Cal.App. 526, 531 [294 P. 84].

[6]*Estate of Alegria,* 87 Cal.App.2d 645, 653-654 [197 P.2d 571].

[7]*Estate of Lingenfelter,* 38 Cal.2d 571, 581 [241 P.2d 990]; *Estate of Phillips,* 202 Cal. 490, 494-495 [261 P. 709]; *Estate of Dole,* 147 Cal. 188, 192 [81 P. 534]; *Estate of Casassa,* 98 Cal.App. 97, 99 [276 P. 366].

[8]*Estate of Presho,* 196 Cal. 639, 652 [238 P. 944].

[9]*Estate of Greenhill,* 99 Cal.App.2d 155, 166 [221 P.2d 310].

Nevertheless, and assuming further that his conduct justified the inference that his mental faculties were impaired and weakened to an extent which warranted the conclusion, as stated by witnesses, that he was of unsound mind, there is nothing in the evidence which tends, either directly or inferentially, to prove that his testamentary act was in the slightest degree influenced or affected by the condition of mind which prompted him to say and do things upon which the witnesses based their opinion.''

Contestant argues that the will is unnatural. Assuming it is—although the trial court might reasonably have inferred that deceased never became reconciled to the fact that Alice had sued him for support—that fact alone is not sufficient ground for setting the will aside. ▮ A will cannot be set aside on the mere ground that it is unjust or unnatural. Evidence is admissible of such facts on an issue of unsoundness of mind, undue influence, or fraud, but the weight to be given such evidence is for the trier of fact.[10] In the case of *In re Wilson*, 117 Cal. 262 [49 P. 172, 711], it is stated (p. 277): ''It is said that the will was unnatural, because but little was left to the husband of the deceased. This is not the fact if we consider both the will and codicil which were probated together; but, as was said in the *Estate of Langford, supra*, [108 Cal. 608 (41 P. 107)] 'the consideration of the question whether or not a will is ''unnatural''—by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud, or undue influence; in which event it might serve to help out a weak case. . . . A will cannot be upset *because*, in the opinion of a jury or court, it is unnatural.' And in *In re McDevitt, supra*, [95 Cal. 17, 33 (30 P. 101)] Temple, C., speaking for the court, said: 'Although I do not think it of special interest here, it is well to remember that one has the right to make an unjust will, an unreasonable will, or even a cruel will.' However, if a man who had always lived in apparently the most affectionate relations with his family should leave a will in which all his property was given to strangers, and no reason could be suggested or explanation made why he thus disinherited those near relatives whom he had always seemed to love—this circumstance would certainly *tend* to show some delusion or

---

[10]*Estate of Gallo*, 61 Cal.App. 163, 174-175 [214 P. 496].

alienation of reason at the time of the testamentary act. But it would not be sufficient to overturn the will in the face of the clear and plenary proof of full testamentary capacity at the time the will was executed; and it would vanish in the presence of a reasonable explanation of the act and a clear intent to do it with a full present knowledge of conditions and consequences.'' ■ Standing alone, unnaturalness of the will is not sufficient to establish undue influence.[11]

■ In the light of the evidence as to the testamentary capacity of the deceased at the very time the will was executed, we cannot say, as a matter of law, that the deceased was of unsound mind at that time. The testimony of the lay witnesses as to the mental condition of the testator at or about the time of the execution of the will presented a conflict in the evidence which it was the province of the trial court to resolve.

■ A presumption of undue influence arises from proof of a confidential relation between a beneficiary and a testator plus proof of activity on the part of the beneficiary in the preparation of the will.[12] Some of the cases say, instead of proof of activity on the part of a beneficiary in the preparation of the will, proof of activity on the part of a beneficiary in procuring the execution of the will.[13] Other cases say that in addition to proof of a confidential relation plus activity in the preparation of the will there must be proof that the beneficiary unduly profited by the will in order that the presumption arise.[14] In *Estate of Harkleroad*,

[11]*Estate of Jamison*, 41 Cal.2d 1, 7, 8 [256 P.2d 984].

[12]*Estate of Higgins*, 156 Cal. 257, 261-262 [104 P. 6]; *Estate of Baird*, 176 Cal. 381, 383 [168 P. 561]; *Estate of Nutt*, 181 Cal. 522, 526 [185 P. 393]; *Estate of Relph*, 192 Cal. 451, 465 [221 P. 361]; *Estate of Witt*, 198 Cal. 407, 420 [245 P. 197]; *Estate of Graves*, 202 Cal. 258, 262-263 [259 P. 935]; *Estate of Doty*, 89 Cal.App.2d 747, 755-756 [201 P.2d 823]; *Estate of Shields*, 49 Cal.App.2d 293, 300 [121 P.2d 795]; *Estate of Hansen*, 38 Cal.App.2d 99, 116 [100 P.2d 776]; *Estate of Anderson*, 29 Cal.App.2d 637, 640 [85 P.2d 212]; *Estate of Wellauer*, 107 Cal.App.2d 268, 272 [236 P.2d 906].

[13]*Estate of Ewan*, 67 Cal.App.2d 111, 115 [153 P.2d 782]. See cases collected 45 West's Cal.Dig. 397, § 163(2) et seq.

[14]*Estate of Shay*, 196 Cal. 355, 363 [237 P. 1079]; *Estate of Presho*, 196 Cal. 639, 651 [238 P. 944]; *Estate of Lances*, 216 Cal. 397, 403-404 [14 P. 768]; *Estate of Keizur*, 64 Cal.App.2d 117, 121 [148 P.2d 116]; *Estate of Abert*, 91 Cal.App.2d 50, 58 [204 P.2d 347] and cases there cited; *Estate of Rabinowitz*, 58 Cal.App.2d 106, 111 [135 P.2d 579]; *Estate of Bucher*, 56 Cal.App.2d 135, 139 [132 P.2d 257]; *Estate of Hampton*, 39 Cal.App.2d 488, 497 [103 P.2d 611]; *Estate of Eakle*, 33 Cal.App.2d 379, 382 [91 P.2d 954]; *Khoury v. Barham*, 85 Cal.App.2d 202, 212 [192 P.2d 823]; *Estate of Schlyen*, 105 Cal.App.2d 648, 660-661

62 Cal.App.2d 60 [144 P.2d 88], the court stated (p. 64): "The general rule is thus stated in *Estate of Witt*, 198 Cal. 407 [245 P. 197]: 'A presumption of undue influence arises from proof of the existence of a confidential relation between the testatrix and the beneficiary "coupled with activity on the part of the latter in the preparation of the will."' In some cases, as in *Estate of Johnson*, 31 Cal.App.2d 251 [87 P.2d 900], the rule is expressed that '"where one who unduly profits by a will sustains a confidential relationship to the testator and actively participates in procuring the execution of the will, the burden is upon him to show that the will was not induced by his undue influence."' Both of these expressions of the rule are essentially the same, although the first does not refer to 'one who unduly profits by a will.' There would be no need for such a presumption and it would serve no purpose where any supposed influence had accomplished nothing."

The presumption is rebuttable.[15] ▮ When proof is made sufficient to give rise to the presumption, the burden is on the beneficiary to show that the will was not procured by his undue influence.[16] ▮ Whether the presumption was overcome is a question for the trier of fact.[17] In *Estate of Keizur*, 64 Cal.App.2d 117 [148 P.2d 116], against the presumption was the testimony of the attorney who prepared the will. He was a beneficiary under the will. He testified he made no suggestions and gave no advice with reference to the terms of the will. This court said (p. 122): "The trial court accepted his testimony and, believing it, was obliged to conclude that the testator acted voluntarily. The decision was one of fact based upon conflicting evidence. Contestant's case at most was a prima facie one, and the finding of the trial court, upon sufficient evidence, that the facts were contrary to the presumption is conclusive upon appeal."

[234 P.2d 211]; *Estate of Chesney*, 102 Cal.App.2d 708, 711 [228 P.2d 46]; *Estate of Rugani*, 108 Cal.App.2d 624, 629 [239 P.2d 500]; 6 Stan. L.Rev. 91, 94. See *Estate of Welch*, 43 Cal.2d 173, 180 [272 P.2d 512].

[15]*Estate of Higgins*, 156 Cal. 257, 261-263 [104 P. 6], in which the facts are similar to those in the present case; *Estate of De Soberanes*, 182 Cal. 525, 528-529 [189 P. 103].

[16]*Estate of Shay*, 196 Cal. 355, 363 [237 P. 1079]; *Estate of Keizur*, 64 Cal.App.2d 117, 122 [148 P.2d 116]; *Estate of Schlyen*, 105 Cal. App.2d 648, 661 [234 P.2d 211].

[17]*Estate of Lances*, 216 Cal. 397, 404 [14 P.2d 768].

No doubt the evidence showed a confidential relation between Wilbur and his father. It may be conceded that Wilbur was active in procuring the execution of the will.[18] It may also be conceded that Wilbur unduly profited by the will since it left nothing to Alice,[19] and that a presumption of undue influence is in the case. But the evidence as to what transpired at the time the will was executed was sufficient to overcome the presumption.[20]

There is no direct evidence that Wilbur importuned the deceased or otherwise exerted any pressure on him either to make a will or to make one in favor of the three children. We cannot say, as a matter of law, that the will was not the natural result of the uncontrolled will of the testator.

The questions in this case were purely factual. There is much evidence that would have supported findings that the deceased was of unsound mind at the time he made the will and that the will was procured by the undue influence of Wilbur. We may not reject the findings of the trial court and substitute findings of our own, even though we might have arrived at a different conclusion had we been the trier of fact. The trial judge having found the evidence to weigh more heavily for respondents, the judgment may be not be disturbed.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 3, 1955.

---

[18]*Estate of Bucher*, 48 Cal.App.2d 465 [120 P.2d 44].

[19]*Estate of Schlyen*, 105 Cal.App.2d 648, 660 [234 P.2d 211].

[20]*Estate of Morcel*, 162 Cal. 188 [121 P. 733]; *Estate of De Soberanes*, 182 Cal. 525 [189 P. 103]; *Estate of Anderson*, 185 Cal. 700, 717-718 [198 P. 407].